1

2

3

4

UNITED STATES DISTRICT COURT

5

NORTHERN DISTRICT OF CALIFORNIA

6

7

| | |
|---|---|
| VALLEY INVESTMENTS-REDWOOD LLC, | Case No. 22-cv-06509-DMR |
| Plaintiff, | **ORDER GRANTING DEFENDANT'S MOTION TO DISMISS** |
| v. | Re: Dkt. No. 10 |
| CITY OF ALAMEDA, | |
| Defendant. | |

8

9

10

11

12

13          Plaintiff Valley Investments doing business as Barnhill Marina & Boatyard alleges that

14    three ordinances enacted by Defendant the City of Alameda (the "City") violate its constitutional

15    rights.  The City now moves to dismiss Plaintiff's complaint pursuant to Federal Rule of Civil

16    Procedure 12(b)(6).  [Docket No. 10 ("Mot.").]  Plaintiff opposed and the City replied.  [Docket

17    Nos. 15 ("Opp'n"), 16 ("Reply").]  The court held a hearing on January 12, 2023.  For the reasons

18    discussed below, the motion is granted.[1]

19    **I.       BACKGROUND**

20          The following facts are derived from the complaint.[2]  Barnhill Marina is a private marina

21    located in the City of Alameda.  Compl. ¶ 21.  In December 2021, Plaintiff purchased Barnhill

22    Marina "with the intent to rehabilitate and manage" it.  *Id.* ¶ 24.  The marina has fifty-six berths

23    and accommodates dozens of floating homes and liveaboard vessels owned by third parties.[3]  *Id.*

24    ────────────────

25    [1] The court also received Plaintiff's request for a CEQA hearing (Docket No. 30) and the City's
       statement of recent decision (Docket No. 32).

26

27    [2] When reviewing a motion to dismiss for failure to state a claim, the court must "accept as true all
       of the factual allegations contained in the complaint."  *Erickson v. Pardus*, 551 U.S. 89, 94 (2007)
       (per curiam) (citation omitted).

28    [3] A floating home, unlike a houseboat or liveaboard vessel, is generally not capable of self-

United States District Court
Northern District of California

¶¶ 22, 25.  Each owner is contractually obligated to pay Plaintiff a monthly berthing fee for their use of the berth connection and other land-side common facilities or amenities.  *Id.* ¶ 28.  The California Floating Home Residency Law ("FHRL"), Cal. Civ. Code § 800, et seq. governs the relationship between Plaintiff and residents of the floating homes.  *Id.*  Under the FHRL, owners are required to provide thirty days' notice before increasing the monthly berthing fee.  *Id.*

In January 2022, Plaintiff notified each floating homeowner and liveaboard resident of its intent to increase berthing fees "to maintain the marina's solvency and functionality."  Compl. ¶ 30.  These increased fees were to take effect on or before April 1, 2022.  *Id.* ¶ 32.  Prior to the scheduled increases, the berthing fees averaged $574 and were approximately 60-71% below market rate.  *Id.* ¶ 31.  According to Plaintiff, the prior owners were able to keep these low rates because they did not adequately maintain the premises, failed to procure flood insurance, enjoyed lower property tax obligations, and did not have the same debt service obligations.  *Id.*

Plaintiff calculated a fee increase for each of the floating homes and vessels based on several factors, including their location and size.  Compl. ¶ 32.  Most berths saw a fee increase between 0-80% while the average fee increase was 30%.  *Id.*  One floating homeowner had his berthing fee raised by 178%.  *Id.*  Plaintiff alleges that it tried to minimize the financial strain on floating homeowners by, for example, accepting to suffer a net monthly loss and extending residents' deadline to pay the increased fee by thirty days.  *Id.* ¶ 33.  Plaintiff also offered to meet with homeowners and the Alameda Floating Home Association, which represents marina residents' interests, to discuss any concerns.  *Id.* ¶ 34.

Around the same time, residents were asking the City to intervene and extend rent control provisions to Barnhill Marina.  Compl. ¶¶ 34-35.  On April 26, 2022, Plaintiff learned that the City was holding a Special Council Meeting to consider the adoption of an urgency ordinance to extend the City of Alameda's Rent Control, Limitations on Evictions, and Relocation Payments to Certain Displaced Tenants Ordinance (the "Rent Control Ordinance") to "maritime residential tenancies including floating homes."  *Id.* ¶ 36.

_____

propulsion over water and is typically permanently, or semi-permanently, connected to dryland and land-based utilities.  Compl. ¶ 22.

United States District Court
Northern District of California

United States District Court
Northern District of California

### A.  The Rent Control Ordinance

The City's Rent Control Ordinance (Ordinance No. 3250) was first enacted in 2016 and is codified at Alameda Municipal Code section 6-58.10 et seq.  Mot. at 3.  It originally provided an exemption to "houseboats" without defining the term.  *See* AMC § 6-58.20.L.  According to the recitals, the Rent Control Ordinance has several key features:

> (a) procedures for the review of rent increases applicable to all rental units, (b) procedures for the stabilization of rent increases above 5% for certain rental units, (c) limitations on the grounds for which landlords may terminate tenancies for tenants in all rental units and (d) a requirement that landlords pay relocation fees when terminating a tenancy for certain reasons, such as a "no cause" tenancy termination.

In addition, section 6-58.75 (Petition Process) allows "[a] Landlord or a Tenant [to] file a petition with the Program Administrator to request an upward or downward adjustment of the Maximum Allowable Rent or Certified Rent" and provides that "[i]n making an individual upward adjustment of Rent, the Hearing Officer shall grant an upward adjustment only if such an adjustment is necessary in order to provide the Landlord with a constitutionally required fair return on property."  AMC § 6-58.75(A), (G).

### B.  Ordinance No. 3317

There are three ordinances at issue.  The first was enacted at a Special Counsel Meeting on April 28, 2022 (the "April 28 Special Counsel Meeting").  It is titled "An Uncodified Urgency Ordinance to Take Effect Immediately Upon its Adoption Concerning Rent Control and Limitations on Evictions Applicable to Maritime Residential Tenancies Including Floating Homes."  [Docket No. 1-3 ("Ordinance No. 3317").]

Ordinance No. 3317 provides in relevant part that "a Rental Unit lawfully docked at a Marina shall be subject to, and a Tenant shall have the protection of, the City's Rent Control Ordinance, and the City's COVID-19 eviction moratorium."  Ordinance 3317, Section 2(A).  It further states that "[f]or Rental Units subject to this Ordinance, no person who imposes rent for a Rental Unit shall increase the rent that was in effect on April 14, 2022 . . . Any notice of a rent increase served prior to (or after) April 14, 2022, which increase was to take effect on or after April 14, 2022, shall be void and have no force or effect."  Ordinance 3317, Section 2(E).

United States District Court
Northern District of California

1   Plaintiff alleges that the latter provision—defining rent as "rent that had been paid on or before

2   April 14, 2022"—was not included in the draft ordinance prepared by the City leading up to the

3   April 28 Special Counsel Meeting.  *Id.* ¶ 43.

4        Under Ordinance No. 3317, a Rental Unit is defined as "a Floating Home, other maritime

5   residential tenancies, or other real property in the City of Alameda offered or available for Rent,

6   and all other Housing Services in connection with the use or occupancy thereof."  Ordinance 3317,

7   Section 1.  "Floating Home" is given the same meaning as in Health and Safety Code section

8   18075.55(d): a floating structure which is (1) designed and built to be used, or is modified to be

9   used, as a stationary waterborne residential dwelling; (2) has no mode of power of its own; (3) is

10  dependent for utilities upon a continuous utility linkage to a source originating on shore; and (4)

11  has a permanent continuous hookup to a shoreside sewage system.  *Id.*

12       Plaintiff alleges that around April 14, 2022, the City's special counsel shared a proposed

13  version of Ordinance No. 3317 with several of the floating homeowners at Barnhill Marina, but

14  not with Plaintiff.  Compl. ¶ 37.  Plaintiff did not receive a letter, notice, or request for input from

15  the City concerning the proposed ordinance or the April 28 Special Counsel Meeting.  *Id.*  Plaintiff

16  asked the City to continue the Special Council Meeting by sixty days, but the City "refused or

17  ignored" the request and proceeded with the meeting.  *Id.* ¶ 38.

18       Plaintiff's counsel, Galin Luk, and a representative for Plaintiff, Drishti Narang, both

19  attended and testified at the April 28 Special Council Meeting.  Compl. ¶ 39.  The City's mayor,

20  Ezzy Ashcraft, also spoke at the meeting and stated that "she has heard many alarming accounts

21  from residents of Barnhill Marina . . . [and] the owner's background does not excuse the kind of

22  behavior experienced by the residents of Barnhill Marina."  *Id.* ¶ 40.  The mayor asked the city

23  attorney whether the proposed ordinance could be applied retroactively "to the date the ordinance

24  was purportedly first published on April 14, 2022" or to April 1, 2022.  *Id.* ¶ 41.  Plaintiff alleges

25  that the mayor sought to apply the ordinance retroactively to ensure that Plaintiff's fee increases,

26  which were to take effect on April 1, 2022, "would be rendered ineffective."  *Id.*  The mayor

27  further indicated that "she expects the owners of Barnhill Marina to challenge the ordinance in

28  court" and asked the city attorney about "the safest course of action with respect to the ordinance's

4

1    retroactivity."  *Id.*

2        **C.  Ordinance No. 3321**

3        On May 17, 2022, the City Council approved and adopted Ordinance No. 3321, titled "An

4    Uncodified Ordinance Concerning Rent Control and Limitations on Evictions Applicable to

5    Maritime Residential Tenancies Including Floating Homes."  *Id.* ¶ 44; [Docket No. 1-4

6    ("Ordinance No. 3321").]  The substantive portions of Ordinance Nos. 3317 and 3321 are

7    "identical or substantially identical."  *Id.* ¶ 44.

8        Although the Ordinances' findings differ in some ways, both state that "most floating

9    home owners are older residents[,] many are on fixed income and there are few slips for floating

10   homes in the Bay Area other than the ones in the Alameda marinas, rendering floating home

11   owners an extremely vulnerable population, and easily subject to exploitation."  Ordinance No.

12   3317 at 2; Ordinance No. 3321 at 2.  The findings further assert that "recently floating

13   homeowners with floating homes in the City of Alameda have been advised that the

14   owner/operation of at least one marina in Alameda intends to increase their monthly rent by as

15   much as 178%."  Ordinance No. 3317 at 3; Ordinance No. 3321 at 2.  In addition, "the City of

16   Alameda faces a . . . housing shortage and has declared a shelter crisis since 2018," and "if

17   floating home residents are not provided with [rent control] protection . . . there will be an

18   immediate and unacceptable disruption to the peace, health, and safety of the City, as vulnerable

19   floating home residents could be immediately and permanently displaced."  Ordinance No. 3317 at

20   3-4; Ordinance No. 3321 at 3.  The Ordinances explain that due to the COVID-19 pandemic,

21   housing displacement "limits opportunities to socially distance and increase (sic) the risk of

22   COVID-19 transmission."  Ordinance No. 3317 at 4; Ordinance No. 3321 at 4.

23       **D.  Ordinance No. 3326**

24       In June 2022, following the enactment of Ordinance Nos. 3317 and 3321, the City

25   informed all City of Alameda marina owners, including Plaintiff, of their obligation to register for

26   the rent control program.  Compl. ¶ 46.  Plaintiff alleges that several owners contested the

27   Ordinances' applicability, arguing that they extended to "floating homes"—not "liveaboard"

28   vessels, which are docked "in significant numbers" at each of the Alameda marinas.  *Id.*

United States District Court
Northern District of California

5

According to Plaintiff, the City adopted Ordinance No. 3326 on September 6, 2022 in response to the marinas' opposition.  Compl. ¶ 47.  Ordinance No. 3326 is titled "Amending the Alameda Municipal Code by Amending Article XV (Rent Control, Limitations on Evictions and Relocation Payments to Certain Displaced Tenants Ordinance) to Adopt and Incorporate Therein Provisions Concerning Floating Homes and Other Marina Residential Tenancies at Floating Home Marinas in the City of Alameda."  [Docket No. 1-5 ("Ordinance No. 3326").]  Plaintiff alleges that Ordinance No. 3326 "carve[s] out all marinas other than Barnhill Marina from the City's rent control expansion."  *Id.*  In a letter to Plaintiff on September 1, 2022, the City explained that the purpose of Ordinance No. 3326 was to "limit[] the application of  the City's Rent Control Ordinance to floating homes and to maritime residential tenancies *at floating home marinas*."  *Id.* ¶ 48 (alterations in original).

Ordinance No. 3326 amends the definition of Rental Unit to include: "a Floating Home, or a vessel/boat with a maritime residential tenancy at a Floating Home Marina, offered or available for Rent in the City of Alameda."  Ordinance No. 3326, Section 1.  According to Plaintiff, the City's goal was to extend rent control to "both floating homes and liveaboards berthed at Barnhill Marina," but not to "the other so-called 'recreational' marinas in the City, even though those marinas also have a number of liveaboards."  *Id.*  Plaintiff contends that, as a result, it is the only marina in the City of Alameda that must comply with rent control obligations.  *Id.* ¶ 49.

The City explained that it adopted Ordinance Nos. 3317, 3321, and 3326 (the "Ordinances") and applied them retroactively because of the City's housing emergency, which was exacerbated by the COVID-19 pandemic.  *Id.* ¶ 50.  Plaintiff asserts that these justifications are "clearly pretextual" because there have been no evictions from an Alameda marina "in this century," nor was there any evidence of a threatened eviction at Barnhill Marina or any other marina at the time.  *Id.*  If residents continue to fail to pay their berthing fees, Plaintiff may have to file for bankruptcy and permanently close.  *Id.* ¶ 56.

Plaintiff claims several constitutional violations by the City in violation of 42 U.S.C. § 1983.  Specifically, Plaintiff alleges the following claims: (1) violation of the Contracts Clause; (2) violation of the prohibition against bills of attainder and ex post facto laws; (3) violation of the

United States District Court
Northern District of California

1   Equal Protection Clause; and (4) violation of both procedural and substantive due process.

2   Plaintiff also alleges a violation of the California Environmental Quality Act ("CEQA").  The City

3   now moves to dismiss all claims.

4   **II.      LEGAL STANDARD**

5           A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the claims alleged in

6   the complaint.  *See Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995).

7   When reviewing a motion to dismiss for failure to state a claim, the court must "accept as true all

8   of the factual allegations contained in the complaint," *Erickson*, 551 U.S. at 94, and may dismiss a

9   claim "only where there is no cognizable legal theory" or there is an absence of "sufficient factual

10  matter to state a facially plausible claim to relief," *Shroyer v. New Cingular Wireless Servs., Inc*.,

11  622 F.3d 1035, 1041 (9th Cir. 2010) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009);

12  *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001)) (quotation marks omitted).  A claim has

13  facial plausibility when a plaintiff "pleads factual content that allows the court to draw the

14  reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at

15  678 (citation omitted).  In other words, the facts alleged must demonstrate "more than labels and

16  conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl.

17  Corp. v. Twombly*, 550 U.S. 554, 555 (2007).

18          Under Federal Rule of Civil Procedure 15(a), leave to amend should be granted as a matter

19  of course, at least until the defendant files a responsive pleading. Fed. R. Civ. P. 15(a)(1).  After

20  that point, Rule 15(a) provides generally that leave to amend the pleadings before trial should be

21  given "freely…when justice so requires."  Fed. R. Civ. P. 15(a)(2).  "This policy is to be applied

22  with extreme liberality." *Eminence Capital, LLC v. Aspeon, Inc*., 316 F.3d 1048, 1051 (9th Cir.

23  2003) (quotation omitted).  However, leave to amend may be denied "where the amendment

24  would be futile." *Gardner v. Martino*, 563 F.3d 981, 990 (9th Cir. 2009).

25  **III.     JUDICIAL NOTICE**

26          Both parties ask the court to take judicial notice of several exhibits.  [Docket Nos. 10-1

27  ("The City's RJN"), 14 ("Plaintiff's RJN").]  Plaintiff objects to the City's RJN as to Exhibits A,

28  B, C, D, E, F, H, K, and to part of Exhibit L.  Opp'n at 7-9.  The City does not oppose Plaintiff's

United States District Court
Northern District of California

1     RJN.

2            Federal Rule of Evidence 201 permits a court to take judicial notice of adjudicative facts.

3     "The court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is

4     generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily

5     determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201.

6     "[A] court may take judicial notice of 'matters of public record,'" *Lee v. City of Los Angeles*, 250

7     F.3d 668, 689 (9th Cir. 2001) (citing *Mack v. S. Bay Beer Distrib.*, 798 F.2d 1279, 1282 (9th Cir.

8     1986)), and the court need not accept as true allegations that contradict facts that are judicially

9     noticed.  *See Mullis v. United States Bankruptcy Ct.*, 828 F.2d 1385, 1388 (9th Cir. 1987).

10           **A.  The City's RJN**

11           The court does not rely on Exhibits A, B, C, D, F, H, and K in its analysis of the City's

12    motion to dismiss.  Accordingly, Plaintiff's objections as to those Exhibits are denied as moot.

13    The court takes judicial notice of Exhibits E and L for the reasons below.

14           Exhibit E is a copy of the City's Rent Control Ordinance No. 3250.  Plaintiff

15    acknowledges that the Rent Control Ordinance is a public record within the meaning of Evidence

16    Rule 201, but objects on grounds that the exhibit appears to contain "several City ordinances not

17    challenged by Plaintiff" that are irrelevant to the City's motion.  Contrary to Plaintiff's assertion,

18    Exhibit E only includes Ordinance No. 3250.  The Rent Control Ordinance is referenced in all

19    three Ordinances challenged by Plaintiff and plays a fundamental role in Plaintiff's claims.

20    Accordingly, the City's request for judicial notice of Exhibit E is granted.

21           Exhibit L is a copy of the Minutes of the Special City Council Meeting of the City of

22    Alameda, dated July 12, 2022 (the "Minutes of the July 12 City Council Meeting").  Plaintiff

23    objects to Exhibit L "out of an abundance of precaution," because pages 179 through 188 appear

24    to erroneously contain documents that belong under Exhibit J, namely "a series of letters . . . sent

25    from the Alameda Rent Program staff to the new owners of Barnhill Marina."  Opp'n at 9.

26    Plaintiff does not object to pages 189 through 216 of Exhibit L, which solely contain the Minutes

27    of the July 12 City Council Meeting.  Because the Minutes constitute a public record and are

28    relevant to the City's motion, the court takes judicial notice of pages 189 through 216 of Exhibit

United States District Court
Northern District of California

1  L.  The court takes judicial notice only as to the existence of these documents and the facts

2  contained therein, and not for the truth of the matters asserted in them.  *See Lee*, 250 F.3d at 690.

3  ### B.  Plaintiff's RJN

4  Plaintiff's Exhibits 1 through 6 were published by the City on its official "Meeting

5  Agendas, Minutes & Videos" webpage.  [Docket No. 14-1 (Dorothy C. Yamamoto Decl., Dec. 5,

6  2022) ¶ 2-7.]  The Exhibits are published agendas and minutes for the April 28 Special City

7  Council Meeting, as well as for the May 17, 2022 and September 6, 2022 City Council meetings.

8  All three meetings pertain to the City's adoption of Ordinance Nos. 3317, 3321, and 3326.  There

9  is no dispute that the Exhibits are public records or that they are relevant to this case.  The court

10  therefore takes judicial notice of the existence of Plaintiff's Exhibits 1 through 6 and the facts

11  contained therein, but not for the truth of the matters stated in them.

12  ## IV.    DISCUSSION

13  ### A.  Contracts Clause

14  Plaintiff alleges that the Ordinances violate the Contracts Clause because they impair its

15  tenants' contractual obligations to pay a monthly berthing fee without serving any legitimate

16  public purpose.  Compl. ¶¶ 60-62.

17  The Contracts Clause provides that "[n]o state shall . . . pass any . . . Law impairing the

18  Obligation of Contracts."  U.S. Const. art. I, § 10, cl. 1.  The Supreme Court recently restated a

19  two-step inquiry to determine whether a state law violates the Contracts Clause.  *See Sveen v.*

20  *Melin*, 138 S. Ct. 1815 (2018).  The first threshold inquiry is "whether the state law has 'operated

21  as a substantial impairment of a contractual relationship.'"  *Id.* at 1821–22 (quoting *Allied*

22  *Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244 (1978)).  If so, the second inquiry asks

23  whether "the law is drawn in an 'appropriate' and 'reasonable' way to advance 'a significant and

24  legitimate public purpose.'"  *Id.* at 1822 (quoting *Energy Reserves Group, Inc. v. Kansas Power &*

25  *Light Co.*, 459 U.S. 400, 411–412 (1983)).

26  ### 1.    Whether the Ordinances Operate as a Substantial Impairment of
            Plaintiff's Contractual Relationships

27

28  The City contends that Plaintiff has pleaded no facts demonstrating that the Ordinances

United States District Court
Northern District of California

cause a substantial impairment to any contract.  Mot. at 9.  To determine whether a substantial impairment exists, courts look to "the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights."  *Sveen*, 138 S. Ct. at 1817.

First, Plaintiff argues that the retroactive nature of the Ordinances eviscerates its reasonable expectation that it could operate at a minimal loss.  Opp'n at 11.  According to Plaintiff, the impairment on its contractual relationships is "so severe" that it may result in bankruptcy and in its permanent closure.  *Id.*  As the City notes, this argument hinges at least in part on whether the Ordinances allow landlords to petition for a rent increase to ensure that their "contractual rights are protected" and that they receive "a fair return on property."  *See* Mot. at 10.  The City contends that Plaintiff failed to avail itself of the fair return petition process guaranteed by the Rent Control Ordinance.  *Id.*

Plaintiff responds that it cannot pursue a fair return remedy because of a repeal provision in the Ordinances.  Opp'n at 11.  According to Plaintiff, each of the Ordinances contains a section that repeals "[a]ny provision of the Alameda Municipal Code" which is inconsistent with the Ordinances themselves.  *See, e.g.*, Ordinance 3326, Section 2.  Plaintiff explains that the Ordinances are inconsistent with, and therefore repeal the fair return petition process in the Rent Control Ordinance because Ordinance Nos. 3317 and 3321 explicitly state that "no person who imposes rent . . . shall increase the rent . . . paid on or before April 14, 2022."  Opp'n at 11.

Plaintiff's position is not supported by the Ordinances' express terms, which are consistent with the Rent Control Ordinance.  Ordinance Nos. 3317 and 3321 specifically reference the fair return petition process,[4] and all three Ordinances incorporate the Rent Control Ordinance, which itself describes the petition process.  *See* Ordinance No. 3317, Section 2(A) ("[A] Rental Unit lawfully docked at the Marina shall be subject to, and a Tenant shall have the protection of, the City's Rent Control Ordinance."); Ordinance No. 3321, Section 2(A) (same); Ordinance No. 3326

---

[4] The preambles of Ordinance of Nos. 3317 and 3321 state: "WHEREAS, the purpose of the City's Rent Control Ordinance is to . . . ensure that landlords receive a fair return on their property."  Ordinance No. 3317 at 3; Ordinance No. 3321 at 3.

1    (amending the Rent Control Ordinance); *see also* Alameda Municipal Code § 6-58.75 (Petition

2    Process).

3          Plaintiff's contention that any petition to increase fees would be "futile" because of the

4    City's "baseless hostility" is conclusory and speculative.  *See* Opp'n at 11.  The Rent Control

5    Ordinance explicitly allows a designee of the City or the Housing Authority to grant landlords an

6    individual rent adjustment.  Plaintiff has not demonstrated that applying for a petition would be

7    futile.[5]

8          Next, Plaintiff argues that the Ordinances interfere with its "reasonable expectations" that

9    the government would not impose rent control on Barnhill Marina.  Opp'n at 12.  The City

10   responds that Plaintiff itself acknowledges that floating homes have long been regulated at the

11   state level by the FHRL, and that residential tenancies have been regulated by the City since 2016.

12   Reply at 2 (citing Compl. ¶¶ 28, 29).

13         In determining the extent of an impairment, courts consider "whether the industry the

14   complaining party has entered has been regulated in the past."  *Energy Rsrvs. Grp.*, 459 U.S. at

15   411-12 (citation omitted).  There is no substantial impairment when the contract is in a regulated

16   industry and the challenged law was "foreseeable as the type of law that would alter contract

17   obligations."  *Id.* at 416.  In *Energy Reserves*, the Supreme Court found that a law did not

18   substantially impair existing contracts because the natural gas industry is "heavily regulated" and

19   "[s]tate authority to regulate natural gas prices is well established."  *Id.* at 414.

20         Plaintiff unsuccessfully tries to distinguish *Energy Reserves*, arguing that no government

21   had ever imposed rent control on Barnhill Marina.  Opp'n at 12.  In *Energy Reserves*, the state had

22   not regulated natural gas prices "specifically" at the time the contracts were executed.  *Energy*

23   *Rsrvs. Grp.*, 459 U.S. at 414.  The Court looked more broadly and found that the state's

24   supervision of the industry—natural gas—had been "extensive and intrusive" for more than 75

25   years.  *Id.*

26

27   _____
     [5] The parties dispute whether Plaintiff's failure to file a fair return petition amounts to a failure to
28   exhaust its administrative remedies.  *See* Reply at 2.  The court need not reach this issue to
     determine whether the Ordinances operate as a substantial impairment of Plaintiff's contractual
     relationships.

United States District Court
Northern District of California

Likewise, "[f]or over a century, landlords . . . have had fair warning that legislation enacted because of emergencies can impact landlord rights." *Williams v. Alameda Cnty.*, No. 3:22-CV-01274-LB, 2022 WL 17169833, at *14 (N.D. Cal. Nov. 22, 2022) (quoting *Gallo v. D.C.*, No. 1:21-CV-03298 (TNM), 2022 WL 2208934, at *7 (D.D.C. June 21, 2022)).  Even when no emergency exists, governments have regulated landlord-tenant relationships through rent control laws, among other means. *See Gallo*, 2022 WL 2208934, at *7.  As the City points out, floating homes have been subject to regulation by the FHRL.

In light of the above, the complaint fails to allege that the Ordinances substantially impaired Plaintiff's contractual relationships with its residents.

### 2.   Whether the Ordinances are Drawn in an Appropriate and Reasonable Way to Advance a Significant and Legitimate Public Purpose

Even if Plaintiff were able to reach the second prong of the Contract Clause analysis, it would fall short because the Ordinances were prompted by a significant and legitimate public purpose. *See Apartment Ass'n of Los Angeles Cnty., Inc. v. City of Los Angeles*, 10 F.4th 905, 913 (9th Cir. 2021), *cert. denied,* 142 S. Ct. 1699 (2022).

When, as here, the government is not a party to the contract at issue, "courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure." *Apartment Ass'n of Los Angeles Cnty.*, 10 F.4th at 913 (quoting *Energy Reserves*, 459 U.S. at 413).  Plaintiff bears the burden of showing that the Ordinances do not serve a valid public purpose or that they are unreasonable. *Id.*

The City asserts that its manifest intent in issuing the Ordinances was to protect vulnerable populations from displacement during a housing crisis exacerbated by the COVID-19 pandemic. Mot. at 10 (citing Ordinance No. 3321).  Plaintiff responds that the City's actions are unreasonable because the housing crisis and the pandemic predated the Ordinances.  Opp'n at 13.

Plaintiff cites *Univ. of Hawai'i Pro. Assembly v. Cayetano*, 183 F.3d 1096, 1107 (9th Cir. 1999) for the proposition that government actions that substantially impair a contract are unreasonable if the problem sought to be resolved existed at the time the contractual obligation was incurred.  Opp'n at 13.  As Plaintiff acknowledged at the hearing, and as deemed significant

United States District Court
Northern District of California

by the Ninth Circuit, in *Cayetano* the government was a party to the contract at issue.  Because the defendants—the Governor and Comptroller of the State of Hawai'i—knew of the budgetary crisis at the time they negotiated the contracts, the court held that it was not reasonable for them to rationalize the government's "pay lag" law based on the state's budgetary problems.  *Id.*  Here, the City is not a party to the contract between Plaintiff and its tenants.

Plaintiff's attempt to analogize *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234 (1978) is also unpersuasive.  There, the plaintiff challenged a Minnesota statute requiring a private employer to pay additional pension benefits if it terminated its pension plans or closed Minnesota offices.  *Id.* at 247.  The Supreme Court struck down the statute under the Contracts Clause because it "did not operate in an area already subject to state regulation at the time the company's contractual obligations were originally undertaken," "did not effect . . . a temporary alteration of the contractual relationship . . . but worked a severe, permanent, and immediate change in those relationships," and "its narrow aim was leveled, not at every Minnesota employer, not even at every Minnesota employer who left the State, but only at those who had in the past been sufficiently enlightened as voluntarily to agree to establish pension plans for their employees."  *Id.*  Importantly, "[t]he law was not even purportedly enacted to deal with a broad, generalized economic or social problem."  *Id.* at 245.

In contrast, here the City's purpose—to protect a vulnerable population from displacement during both a housing emergency and a pandemic—is expressly stated in Ordinance Nos. 3317 and 3321: "if floating home residents are not provided with the same protection as other tenants in the City, there will be an immediate and unacceptable disruption to the peace, health, and safety of the City, as vulnerable floating home residents could be immediately and permanently displaced."

The legislative record further indicates that the City's purpose in enacting the Ordinances was to provide protections "to the greatest extent possible" for "people living on boats long-term."  Minutes of the July 12 City Council Meeting at 12.  The Ninth Circuit has recognized that a city's efforts to "mitigate the fallout for those most affected by a shift in the market is a permissible state purpose, even if some may question its policy wisdom."  *San Francisco Taxi Coal. v. City & Cty. of San Francisco*, 979 F.3d 1220, 1225 (9th Cir. 2020).

1    Plaintiff further objects that the Ordinances are unreasonable because they are "open-ended

2    in duration" and purposefully "exclude all other marinas" from rent control requirements. Opp'n

3    at 14. As to the first objection, Plaintiff asserts that the Ordinances may "potentially surviv[e]

4    even the declared states of the emergency the Ordinances are supposedly addressing." *Id.* While

5    that may be the case, it is not the court's role to "second guess" the City's determination that

6    indefinitely extending the Rent Control Ordinance to floating home marinas constitutes "the most

7    appropriate way" of dealing with the issues identified. *See Apartment Ass'n of L.A.*, 10 F.4th at

8    914 (citation omitted). As Plaintiff conceded at the hearing, courts are not required to consider the

9    availability of less intrusive means under the Contracts Clause.

10    Second, Plaintiff's objection that the Ordinances "exclude all other marinas" from rent

11    control requirements mischaracterizes the record. The Ordinances' express terms make clear that

12    their provisions apply to all floating homes and liveaboards at floating home marinas. In addition,

13    a law that appears to target one business group over another "is not *a priori* suspect." *DoorDash,*

14    *Inc. v. City & Cnty. of San Francisco*, No. 21-CV-05502-EMC, 2022 WL 867254, at *11 (N.D.

15    Cal. Mar. 23, 2022). Here, the preamble to Ordinance Nos. 3317 and 3321 explains that "floating

16    home owners with floating homes in the City of Alameda have been advised that the

17    owner/operator of at least one marina in Alameda intends to increase their monthly rent by as

18    much as 178%." Ordinance No. 3317 at 3; Ordinance No. 3321 at 2. To address this issue, the

19    Ordinances limit rent increases to changes in the Consumer Price Index and establish a petition

20    process to ensure that landlords receive a fair return on their property. Under these circumstances,

21    Plaintiff cannot plausibly allege that the City's chosen scope is not a reasonable fit for the

22    legitimate public purpose of protecting vulnerable residents from displacement.

23    Finally, Plaintiff contends that several "practical matters" underscore the City's true

24    intentions: 1) Plaintiff was excluded from communications regarding the Ordinances, 2) no marina

25    resident was actually at risk of displacement, and 3) the City failed to adopt other reasonable

26    methods to address its concerns.[6] Opp'n at 14. In light of the considerable deference afforded to

27

28    [6] In support of the third point, Plaintiff cites *Apartment Ass'n of Los Angeles Cnty.*, which held
     that the City of Los Angeles' temporary and broadly applicable moratorium on evictions from

legislatures in assessing the reasonableness of legislation, these assertions do not change the

outcome in this case.  *See Apartment Ass'n of Los Angeles Cnty.*, 10 F.4th at 914.

In sum, Plaintiff has not satisfied either prong of the Contract Clause analysis.

Accordingly, the City's motion to dismiss is granted with respect to that claim.

### B.  Bill of Attainder and Ex Post Facto

Plaintiff alleges that Ordinance Nos. 3317, 3321, and 3326 constitute bills of attainder and

ex post facto laws because the City enacted them to inflict punishment on Plaintiff without judicial

trial, by retroactively nullifying or attempting to nullify Plaintiff's increased berthing fees.

Compl. ¶ 69.

### 1.  Bill of Attainder

The Constitution states that "No Bill of Attainder . . . shall be passed."  U.S. Const. art. I, §

9, cl. 3.  A bill of attainder is "a law that legislatively determines guilt and inflicts punishment

upon an identifiable individual without provision of the protections of a judicial trial."  *SeaRiver*

*Mar. Fin. Holdings, Inc. v. Mineta*, 309 F.3d 662, 668 (9th Cir. 2002) (*quoting Nixon v. Adm'r of*

*Gen. Servs.*, 433 U.S. 425, 468 (1977)).  A statute is an unconstitutional bill of attainder if it (1)

specifies the affected persons, and (2) inflicts punishment (3) without a judicial trial.  *Id.* (citing

*Selective Serv. Sys. v. Minnesota Pub. Interest Research Group*, 468 U.S. 841, 847 (1984)).  Three

factors inform whether a statute inflicts punishment on the specified individual or group: "(1)

whether the challenged statute falls within the historical meaning of legislative punishment; (2)

whether the statute, viewed in terms of the type and severity of burdens imposed, reasonably can

be said to further nonpunitive legislative purposes; and (3) whether the legislative record 'evinces

a congressional intent to punish."  *SeaRiver*, 309 F.3d at 673 (internal quotation marks omitted).

As to the first factor, price controls that limit the rate of rent increases do not fall within the

historical meaning of legislative punishment.  "Traditionally, bills of attainder sentenced the

---

land-based dwellings survived Contracts Clause scrutiny.  *See* Opp'n at 15.  At the hearing,
Plaintiff explained that *Apartment Ass'n of Los Angeles Cnty.* provides the "flipside" of an
appropriate statute under the Contracts Clause.  The case does not preclude the government from
addressing housing concerns differently.  To the contrary, *Apartment Ass'n of Los Angeles Cnty.*
restated the established proposition that courts are constrained to apply a deferential standard
under the Contracts Clause.  *See Apartment Ass'n of Los Angeles Cnty.*, 10 F.4th at 914.

United States District Court
Northern District of California

1   named individual to death, imprisonment, banishment, the punitive confiscation of property by the

2   sovereign, or erected a bar to designated individuals or groups participating in specific

3   employments or vocations." *SeaRiver*, 309 F.3d at 673 (citing *Nixon*, 433 U.S. at 473–74).

4       With respect to the second factor, the Ordinances were enacted for the stated non-punitive

5   legislative purpose of protecting vulnerable populations from the risk of displacement—

6   particularly amid a housing crisis and a pandemic.  The Ordinances address this risk by protecting

7   floating homeowners and marina residents from exorbitant rent increases, while allowing for

8   landlords to petition for a higher rent through the fair return petition process.

9       As to the final factor—whether the legislative record evinces a congressional intent to

10   punish—Plaintiff argues that the mayor expressly chastised Barnhill Marina at a public meeting

11   and cited it as the reason for the Ordinances.  Opp'n at 16 (citing Compl. ¶¶ 40-41).  Plaintiff

12   further asserts that, in effect, the Ordinances apply only to Barnhill Marina and "restrain or deter"

13   it from collecting berthing fees "in the amounts reflected by Plaintiff's fee increase notices already

14   issued."  *Id.*  In other words, Plaintiff argues, the Ordinances implicate "the primary objectives of

15   criminal law: retribution and deterrence."  Opp'n at 16.

16       The City "may discriminate against certain classes without violating the prohibition on

17   bills of attainder—it may not apply that discrimination in a way that punishes a person or class."

18   *Hasbrouck v. Cnty. of Yavapai*, No. CV-20-08112-PCT-DWL, 2021 WL 4458239, at *7 (D. Ariz.

19   Sept. 29, 2021).  Where there is a "definitive link" between the plaintiff's past conduct and the

20   consequence that the statute imposes, courts have upheld the statutes at issue based on their

21   legitimate non-punitive purpose.  *See SeaRiver*, 309 F.3d at 675.

22       Here, the fact that the mayor was aware of Plaintiff's fee increases, and therefore, that the

23   Ordinances would impose an additional burden on Plaintiff, does not alter the Ordinances' non-

24   punitive nature.  *See SeaRiver*, 309 F.3d at 674 ("Although Congress was aware when it

25   passed [the relevant statute] that it would impose a cost on [the plaintiff], this awareness does not

26   translate into a suggestion that Congress's intent was to punish rather than to reduce the

27   environmental risk.").  Plaintiff conceded this point at the hearing, acknowledging that a law is not

28   punitive in nature simply because it targets a specific entity.

United States District Court
Northern District of California

16

The legislative record does not evince an intent to punish.  *See SeaRiver*, 309 F.3d at 676 (citation omitted).  The minutes of the September 6 Special Council Meeting at which Ordinance No. 3326 was enacted indicate that the City Council's aim was "to ensure people in floating home marinas were protected."  [Docket No. 14-7 at 9.]  To that end, the City Council "directed staff to make contact with all marina operators in order to gain better clarification about whether the ordinance needs to apply to a wider group."  *Id.*  Ultimately, "staff . . . recommend[ed] final passage [of Ordinance No. 3326] in order to provide protections [to residents]."  Similar findings are expressly included in the preamble to Ordinance Nos. 3317 and 3321.  *See, e.g.*, Ordinance No. 3317 at 4 ("if floating home residents are not provided with the same protection as other tenants in the City, there will be an immediate and unacceptable disruption to the peace, health, and safety of the City, as vulnerable floating home residents could be immediately and permanently displaced"); Ordinance No. 3321 at 3 (same).

As the complaint fails to plausibly allege that the Ordinances inflict punishment within the meaning of the constitutional prohibition against bills of attainder, Plaintiff's claim is dismissed.[7]

---

[7] Plaintiff also opposes the motion to dismiss its bill of attainder claim arguing that it has alleged the element of specificity.  *See* Opp'n at 16.  Several guideposts inform whether a law singles out a person or class.  *See Franceschi v. Yee*, 887 F.3d 927, 941–42 (9th Cir. 2018).  Courts consider (a) whether the provision explicitly names the individual or class, or instead describes the affected population in terms of general applicability; (b) whether the identity of the individual or class was "easily ascertainable" when the legislation was passed; (c) whether the legislation defines the individual class "by past conduct" that operates only as a designation of particular persons; and (d) whether the provision defines the specific individual or class affected by the "irreversible acts committed by them."  *Id.* (citing *SeaRiver*, 309 F.3d at 669 (itself quoting *Selective Serv. Sys.*, 468 U.S. at 847 (1984)).

Specifically, Plaintiff argues that although the Ordinances do not expressly name Barnhill Marina, Plaintiff is "easily ascertainable."  Opp'n at 16.  In support, Plaintiff highlights two allegations in the complaint: 1) the mayor expressly identified Plaintiff in her public comments during the April 28 Special Council Meeting and 2) the City passed Ordinance No. 3326 to carve out other Alameda marinas.  Opp'n at 16 (citing Compl. ¶¶ 46-49).

For its part, Defendant primarily relies on *Nixon*, in which the Supreme Court declined to find that a congressional act directing the General Services Administration to take custody of President Nixon's papers and tape recording was an unlawful bill of attainder.  *See* Reply at 3; *Nixon*, 433 U.S. at 468.  In *Nixon*, the Court concluded that "the Act's specificity—the fact that it refers to [President Nixon] by name—does not automatically offend the Bill of Attainder Clause."  *Nixon*, 433 U.S. at 471–72.  The Court further explained that "[b]y arguing that an individual or defined group is attainted whenever he or it is compelled to bear burdens which the individual or group dislikes, appellant removes the anchor that ties the bill of attainder guarantee to realistic conceptions of classification and punishment."  *Id.* at 470.  Plaintiff does not engage with or

*See Fowler Packing Co., Inc. v. Lanier*, 844 F.3d 809, 817 (9th Cir. 2016) (finding that carve-outs in challenged legislation did not impose punishment and declining to address whether they satisfied the other two elements of a bill of attainder claim).

### 2.   Ex Post Facto

The Constitution prohibits state governments from enacting any "ex post facto Law."  Art. I, § § 10, cl. 1.  "The Ex Post Facto Clause prohibits the government from enacting laws with certain retroactive effects, including laws that change the punishment and inflict greater punishment for the crime than the punishment authorized by law when the crime was committed." *Cody v. Grounds*, No. C 12-2603 SI PR, 2012 WL 2953179, at *3 (N.D. Cal. July 19, 2012) (citing *Stogner v. California*, 539 U.S. 607, 611–12 (2003); *Calder v. Bull*, 3 U.S. 386 (1798)).

The parties do not dispute that the ex post facto rule applies only where a criminal penalty is implicated.  *See* Mot. at 14; Opp'n at 15.  Instead, Plaintiff argues that the complaint alleges "ample facts" establishing the City's "*punitive intent* and the *punitive effect* of the Ordinances." Opp'n at 16 (emphasis in original).  The City disagrees.  Reply at 4.

At the hearing, Plaintiff conceded that the ex post facto claim must be dismissed if the bill of attainder claim fails on the infliction of punishment prong.  Accordingly, the City's motion is granted as to Plaintiff's ex post facto claim.  *See also Hasbrouck v. Cnty. of Yavapai*, No. CV-20-08112-PCT-DWL, 2021 WL 4458239, at *6, n.4 (D. Ariz. Sept. 29, 2021) (dismissing ex post facto claim because statute at issue did not create a criminal offense and was not punitive under the court's Bill of Attainder analysis).

### C.  Equal Protection Clause

The complaint alleges an equal protection claim on grounds that "the government is subjecting only the Plaintiff to differing and unique treatment compared to others who are similarly situated."  Compl. ¶ 76.  According to Plaintiff, the City is extending rent control solely

---

distinguish *Nixon*.

 As the court concluded that the Ordinances do not impose punishment, it need not decide whether they satisfy the claim's remaining elements.  *See Fowler Packing Co., Inc. v. Lanier*, 844 F.3d 809, 817 (9th Cir. 2016).

1    to the floating homes and liveaboards berthed at Barnhill Marina and without any rational basis

2    that the Ordinances would advance a legitimate public purpose.  *Id.* ¶ 77.

3           "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall

4    'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a

5    direction that all persons similarly situated should be treated alike."  *City of Cleburne v. Cleburne*

6    *Living Ctr.*, 473 U.S. 432, 439 (1985) (quoting *Plyler v. Doe*, 457 U.S. 202, 216 (1982)).

7    Typically, claims under the Equal Protection Clause challenge "governmental classifications that

8    'affect some groups of citizens differently than others.'"  *Engquist v. Oregon Dep't of Agr.*, 553

9    U.S. 591, 601 (2008) (quoting *McGowan v. Maryland*, 366 U.S. 420, 425 (1961)).

10          As a preliminary matter, the parties disagree about the applicable theory of liability.

11   Plaintiff argues that it can establish its claim under a class-of-one theory by demonstrating that

12   Barnhill Marina was "intentionally and irrationally" singled out.  Opp'n at 16 (citing *Engquist*,

13   553 U.S. 591, 601-2).  The City responds that the class-of-one theory only applies when the

14   plaintiff alleges discriminatory *enforcement* of a specific law.  Reply at 4.  As Plaintiff claims that

15   the City discriminated against Barnhill Marina "by not regulating more," the City asserts that the

16   "class-of-one theory" is inapplicable.  *Id.* at 5.

17          A "class-of-one" equal protection claim, which does not depend on a suspect classification

18   such as race or gender, arises where the plaintiff was (1) "intentionally treated differently from

19   others similarly situated" and (2) "there is no rational basis for the difference in treatment."

20   *Village of Willowbrook v. Olech,* 528 U.S. 562, 564 (2000).  "Such circumstances state an Equal

21   Protection claim because, if a state actor classifies irrationally, the size of the group affected is

22   constitutionally irrelevant."  *Lazy Y Ranch Ltd. v. Behrens,* 546 F.3d 580, 592 (9th Cir.

23   2008) (citing *Olech,* 528 U.S. at 564). "When those who appear similarly situated are nevertheless

24   treated differently, the Equal Protection Clause requires at least a rational reason for the

25   difference, to ensure that all persons subject to legislation or regulation are indeed being 'treated

26   alike, under like circumstances and conditions.'"  *Engquist*, 553 U.S. at 602 (quoting *Hayes v.*

27   *Mo.,* 120 U.S. 68, 71–72 (1887)).

28          As both parties agree that a suspect classification is not implicated and that rational basis

United States District Court
Northern District of California

1   review applies to Plaintiff's equal protection claim, the court need not decide whether Plaintiff's

2   class-of-one theory is cognizable as a matter of law.  *See* Mot. at 14; Opp'n at 17.  Accordingly,

3   the court reviews Plaintiff's claim under the rational basis test.  *See Hotop v. City of San Jose*, 982

4   F.3d 710, 717 (9th Cir. 2020).  Under this standard, the inquiry is "whether the legislation bears a

5   rational relationship to a legitimate state interest."  *San Francisco Taxi Coal*, 979 F.3d at 1224

6   (citation omitted).

7          In *Hotop*, the court held that the City of San Jose's ordinance, which conditioned

8   landlords' ability to increase rents on disclosing information about their rent stabilized units,

9   "easily . . . survive[d] rational basis review" even though it differentiated between types of rental

10  units.  982 F.3d at 717.  The court found that the defendant had a rational basis for drawing the

11  distinctions based in part on the significant resources it would have had to spend if the ordinance

12  were expanded.  *Id.*

13         Plaintiff contends that, unlike in *Hotop*, its complaint cites numerous facts showing

14  irrational and arbitrary treatment by the City.  Opp'n at 18.  However, "[w]here a regulation or

15  statute affects only economic . . . interests," as here, "the state is free to create any classification

16  scheme that does not invidiously discriminate."  *San Francisco Taxi Coal.*, 979 F.3d at 1224

17  (citation omitted).  If there are "plausible, arguable, or conceivable reasons which may have been

18  the basis for the distinction," the Ordinances must be upheld.  *Id.* (citation omitted).  None of

19  Plaintiff's allegations meaningfully refute the stated legitimate legislative purpose to provide

20  affordable housing and protect vulnerable residents from displacement or constructive eviction.

21         Plaintiff further argues that, even if the City had a rational basis for enacting the

22  Ordinances, it can show that this basis was simply a pretext.  Opp'n at 17.  Plaintiff cites *Engquist*

23  *v. Oregon Dep't of Agr.* for this proposition, which explained that "in an equal protection claim

24  based on *selective enforcement* of the law, a plaintiff can show that a defendant's alleged rational

25  basis for his acts is a pretext for an impermissible motive."  Opp'n at 17 (quoting *Engquist*, 478

26  F.3d 985, 993 (9th Cir. 2007) (emphasis added), *aff'd sub nom. Engquist v. Oregon Dep't of Agr.*,

27  553 U.S. 591 (2008)).  Plaintiff does not allege that the City enforced the Ordinances in a

28  discriminatory way, nor has it provided persuasive authority to support its contention at the

United States District Court
Northern District of California

United States District Court
Northern District of California

1 | hearing that enactment of the Ordinances amounts to enforcement in this case.[8]  *Cf. Squaw Valley*

2 | *Dev. Co. v. Goldberg*, 375 F.3d 936, 945 (9th Cir. 2004) (cited by Plaintiff for the same

3 | proposition) (examining pretext where plaintiffs, who operated a ski resort, claimed that two

4 | employees working for the state water quality authority subjected them to selective and over-

5 | zealous regulatory oversight).

6 | Because the City's reasons for enacting the Ordinances were rational, Plaintiff fails to state

7 | a plausible violation of the Equal Protection Clause.  Accordingly, the City's motion to dismiss is

8 | granted with respect to this claim.

9 | **D.  Due Process Clause**

10 | Plaintiff alleges that the Ordinances also violate the Due Process Clause, which provides

11 | that no state may "deprive any person of life, liberty, or property, without due process of law[.]"

12 | U.S. Const., amend. XIV.  Plaintiff asserts both procedural and substantive due process claims.

13 | **1.  Procedural Due Process**

14 | To allege a violation of procedural due process, Plaintiff must establish: "(1) a liberty or

15 | property interest protected by the Constitution; (2) a deprivation of the interest by the government;

16 | [and] (3) lack of process."  *Portman v. Cty. of Santa Clara*, 995 F.2d 898, 904 (9th Cir. 1993).

17 | Notice and a meaningful opportunity to be heard are "the hallmarks of procedural due process."

18 | *Ludwig v. Astrue*, 681 F.3d 1047, 1053 (9th Cir. 2012) (internal quotations and citation omitted).

19 | Plaintiff claims it has a protected property interest in its vested contractual rights to collect

20 | the increased fee amounts effective April 1, 2022, as well as in the marina itself.  Opp'n at 19.

21 | Even assuming Plaintiff had a vested interest in the rent increases allowed by prior law, Plaintiff's

22 | theory that the City excluded Barnhill Marina from the political process fails to state a claim for

23 | procedural due process.  Opp'n at 19-20.

24 | When "the action complained of is legislative in nature, due process is satisfied when the

25 | legislative body performs its responsibilities in the normal manner prescribed by law."  *Hotel &*

26 |

27 | _____

28 | [8] At the hearing, Plaintiff's counsel argued that enactment may amount to enforcement in some cases.  Counsel cited a single case in support of her argument—*Hotop v. City of San Jose*, 982 F.3d 710 (9th Cir. 2020)—which does not address the issue.

*Motel Ass'n of Oakland v. City of Oakland*, 344 F.3d 959, 969 (9th Cir. 2003) (internal quotation marks and citation omitted).  This is because "even though an individual's property rights may be affected by the enactment of a general statute, where a rule of conduct applies to more than a few people, it is impracticable that everyone should have a direct voice in its adoption." *Id.* (cleaned up).  However, where "only a few persons are targeted or affected and the state's action exceptionally affects them on an individual basis," greater procedural rights may attach.  *Id.* (cleaned up) (quoting *Harris v. County of Riverside*, 904 F.2d 497, 502 (9th Cir. 1990)).  "[T]he mere fact that a subcategory of [entities] motivated the [government] to act does not change the legislative quality of the ordinance." *Id.*

Here, Plaintiff makes the conclusory argument that the City did not act in a "normal manner prescribed by law" and undertook "targeted efforts to exclude Plaintiff from the political process and public notices."  Opp'n at 19-20 (citing Compl. ¶¶ 37-40, 45).  The allegations cited by Plaintiff assert that: 1) the City shared a proposed version of Ordinance No. 3317 with floating homeowners at Barnhill Marina, but Plaintiff did not receive a "letter, notice, or request for input" from the City (Compl. ¶ 37), 2) the City refused or ignored Plaintiff's request to continue the April 28 Special Council Meeting (Compl. ¶ 38), 3) the mayor expressed support for passing the emergency ordinance at the April 28 Special Council Meeting, noting that Plaintiff's "background does not excuse the kind of behavior experienced by the residents of Barnhill Marina" (Compl. ¶ 40), and 4) the City did not notify or include Plaintiff in discussions regarding the City's Capital Improvement Plan as it related to the Rent Control Ordinance (Compl. ¶ 45).

Plaintiff does not cite any authority to support that any of the alleged acts or omissions constitute a failure by the City to perform its responsibilities "in the normal manner prescribed by law."  In addition, the complaint does not respond to the City's argument that it published agendas consistent with open meeting laws and held three public meetings on April 28, 2022, May 17, 2022, and July 12, 2022 as required by the ordinary legislative process.  *See* Mot. at 16.  As the City points out, the complaint acknowledges that Plaintiff's representatives appeared and testified during public meetings on the Ordinances.  *See* Compl. ¶ 39 (recounting comments made by Plaintiff's counsel, Galin Luk, and Plaintiff's representative, Drishti Narang, to the City Council,

United States District Court
Northern District of California

as recorded in minutes of the April 28 Special Council Meeting).  Because the City Council "exercised its legislative functions in a lawful manner, [Plaintiff] received all the process that was due."  *Hotel & Motel Ass'n of Oakland*, 344 F.3d at 970; *see also Sierra Lake Rsrv.*, *Sierra Lake Rsrv. v. City of Rocklin*, 938 F.2d 951, 957 (9th Cir. 1991) ("Even assuming that plaintiff had a vested interest in the rent increases allowed by prior law, it received all the process due it when the City's elected officials discharged their legislative responsibilities in the manner prescribed by law.").

Plaintiff also argues that the City acted "wrongfully and arbitrarily, depriving Plaintiff of a property right that had vested."  Opp'n at 20.  Plaintiff cites *Sierra Lake Rsrv. v. City of Rocklin*, 938 F.2d 951 (9th Cir. 1991) for the proposition that such allegations may amount to a claim for denial of procedural due process.  *See* Opp'n at 20.  In *Sierra Lake*, the court held that the plaintiff's claim that a city employee treated his application wrongfully and arbitrarily was "indistinguishable" from a substantive due process claim.  *See* 938 F.2d at 957 (explaining that the plaintiff's procedural due process claims could "equally well be stated as substantive due process claims.").  Because Plaintiff similarly alleges that the denial of due process consists of the City's arbitrary action, the court addresses the claim below.

### 2.   Substantive Due Process Claim

A "regulation that fails to serve any legitimate governmental objective may be so arbitrary or irrational that it runs afoul of the Due Process Clause."  *Ballinger v. City of Oakland*, 398 F. Supp. 3d 560, 575 (N.D. Cal. 2019), *aff'd,* 24 F.4th 1287 (9th Cir. 2022) (quoting *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 542 (2005)).  The plaintiff's burden on such a claim is "extremely high."  *Richardson v. City & Cnty. of Honolulu*, 124 F.3d 1150, 1162 (9th Cir. 1997).

Here, Plaintiff argues that the Ordinances violate substantive due process because they deprive Plaintiff of a fair return on its property and are "are clearly arbitrary and unreasonable with no substantial relation to public health, safety, or general welfare."  Opp'n at 19.  Relatedly, and as mentioned above, Plaintiff contends that the City acted wrongfully and arbitrarily in enacting the Ordinances.  *Id.* at 19-20.

Because infringement of a substantive due process right requires Plaintiff to demonstrate

1    that the Ordinances have no legitimate purpose, and the legislative record in this case adequately

2    shows that the stated purpose of the Ordinances is to protect vulnerable residents from

3    displacement, Plaintiff fails to state a claim for substantive due process under either theory.  In

4    addition, Plaintiff does not meaningfully grapple with the availability of a fair return petition

5    process.  Accordingly, Plaintiff's due process claim is dismissed in its entirety.

6          **E.  California Environmental Quality Act**

7          Under the California Environmental Quality Act ("CEQA"), public agencies are required

8    to "prepare, or cause to be prepared by contract, and certify the completion of, an environmental

9    impact report on any project which they propose to carry out or approve that may have a

10   significant effect on the environment."  Cal. Pub. Res. Code §§ 21100(a), 21151(a).  CEQA

11   establishes a three-tier system to evaluate agency action for environmental effects:

12               First, the agency must determine whether the proposed activity is
             subject to CEQA at all. Second, assuming CEQA is found to apply,
13           the agency must decide whether the activity qualifies for one of the
             many exemptions that excuse otherwise covered activities from
14           CEQA's environmental review. Finally, assuming no applicable
             exemption, the agency must undertake environmental review of the
15           activity[.]

16   *San Francisco Taxi Coal.*, 979 F.3d at 1226 (quoting *Union of Med. Marijuana Patients, Inc. v.*

17   *City of San Diego*, 7 Cal. 5th 1171, 1185 (2019)).  In analyzing the first tier, the agency is required

18   to "conduct a preliminary review to determine whether the proposed activity constitutes a 'project'

19   for purposes of CEQA."  *Id.*  (citation omitted).  If an activity is not a "project," it is not subject to

20   CEQA.  *Id.*

21          Plaintiff first objects to the City's determination that the Ordinances were not a "project"

22   under CEQA.  Compl. ¶¶ 96-98.  The Ordinances constitute a "project" under CEQA if "the

23   activity is capable of causing a direct or reasonably foreseeable indirect physical change in the

24   environment."  California Code of Regulations § 15378.

25          Plaintiff argues that the Ordinances constitute a CEQA "project" because they will directly

26   affect its "land use decisions."  Opp'n at 21.  It further explains that, because of the Ordinances, it

27   will not be able to raise the expected revenue needed for essential repairs.  *Id.* at 22 (citing Compl.

28   ¶¶ 2, 24).  For example, Plaintiff will not be able to maintain or repair sewage lines, access to

                                            24

United States District Court
Northern District of California

United States District Court
Northern District of California

1   utilities, and other resources, which in turn may result in "increased water pollution, poor water

2   quality, disrupt wildlife," and in the event of bankruptcy and the permanent closure of the marina,

3   "overcrowd the other marinas and increase foot traffic in those other areas." *Id.* (citing Compl. ¶¶

4   25, 56).

5         "[A]n indirect effect is not reasonably foreseeable if . . . the postulated causal mechanism

6   connecting the activity and the effect is so attenuated as to be speculative." *San Francisco Taxi*

7   *Coal.*, 979 F.3d at 1226 (internal quotation marks omitted).  Here, the complaint does not

8   plausibly allege that the Ordinances will result in Plaintiff's inability to maintain the property or in

9   its inevitable bankruptcy and closure.  Most notably, the complaint does not allege any non-

10  attenuated connection between Plaintiff's inability to maintain the property and the potential

11  impact on the environment.  Even if Plaintiff failed to maintain or repair its property, the assertion

12  of significant environmental change as a result of this failure "appears to rest on speculation,"

13  which is insufficient to allege that the Ordinances constitute a "project" under CEQA.  *See id.*

14        Because the Ordinances are not a "project" under CEQA, and therefore are not subject to

15  its provisions, the court need not reach the parties' remaining arguments.[9]  Accordingly, Plaintiff's

16  CEQA claim is dismissed without leave to amend.

17  //

18  //

19  //

20  //

21  //

22  //

23  //

24

25

26

27  _____

[9] For example, the parties dispute whether Plaintiff's CEQA claim fails as a matter of law because it did not exhaust its administrative remedies.  Mot. at 20.  The court received the City's related notice of recent decision, *Arcadians for Env't Pres. v. City of Arcadia*, 304 Cal. Rptr. 3d 668 (Ct.

28  App. 2023), which discusses the issue.  [Docket No. 32.]  However, the court need not decide this question to determine whether the complaint states a CEQA claim.

**V.      CONCLUSION**

For the foregoing reasons, the City's Motion to Dismiss is granted.  As Plaintiff represented at the hearing that amendment would not be futile, the dismissal is without prejudice. Plaintiff's motion for preliminary injunction (Docket No. 17) and request for a hearing on the CEQA petition (Docket No. 30) are denied as moot.  Plaintiff may file an amended complaint within fourteen days of the date of this order.  Plaintiff must plead its best case.

**IT IS SO ORDERED.**

Dated: April 10, 2023

_____
Donna M. Ryu
Chief Magistrate Judge

United States District Court
Northern District of California