1

2

3

4                            UNITED STATES DISTRICT COURT

5                          NORTHERN DISTRICT OF CALIFORNIA

6

7    VALLEY INVESTMENTS-REDWOOD          Case No.  22-cv-06509-DMR
     LLC,
8
                   Plaintiff,
9                                        ORDER GRANTING MOTION TO
          v.                             DISMISS THE FIRST AMENDED
10                                       COMPLAINT
11   CITY OF ALAMEDA,                    Re: Dkt. No. 35
                   Defendant.
12

13        Plaintiff Valley Investments doing business as Barnhill Marina & Boatyard alleges that

14   three ordinances enacted by Defendant the City of Alameda (the "City") violate its constitutional

15   rights.  The court previously granted the City's motion to dismiss the complaint with leave to

16   amend, except as to Plaintiff's claim under the California Environmental Quality Act.  [Docket

17   No. 33 ("MTD Order").]  Plaintiff subsequently filed the first amended complaint ("FAC").

18   [Docket No. 34.]  The City now moves to dismiss the FAC pursuant to Federal Rule of Civil

19   Procedure 12(b)(6).  [Docket No. 35 ("Mot.").]  Plaintiff opposed and the City replied.  [Docket

20   Nos. 37 ("Opp'n"), 38 ("Reply").]  This matter is suitable for determination without a hearing.

21   Civ. L.R. 7-1(b).  For the reasons discussed below, the motion is granted.

22   I.    BACKGROUND

23        The following facts come from the FAC.[1]  Barnhill Marina & Boatyard ("Barnhill

24   Marina") is a private marina located in the City of Alameda.  FAC ¶ 20.  In December 2021,

25   Plaintiff purchased Barnhill Marina "with the intent to rehabilitate and manage" it.  *Id.* ¶ 23.  The

26

27   _____
     [1] When reviewing a motion to dismiss for failure to state a claim, the court must "accept as true all
28   of the factual allegations contained in the complaint."  *Erickson v. Pardus*, 551 U.S. 89, 94 (2007)
     (per curiam) (citation omitted).

marina has fifty-six berths and accommodates dozens of floating homes[2] and liveaboard vessels owned by third parties.  *Id.* ¶¶ 21, 24.  Each owner is contractually obligated to pay Plaintiff a monthly berthing fee for their use of the berth connection and other land-side common facilities or amenities.  *Id.* ¶ 27.  The California Floating Home Residency Law ("FHRL"), Cal. Civ. Code § 800, et seq. governs the relationship between Plaintiff and residents of the floating homes.  *Id.* Under the FHRL, owners are required to provide thirty days' notice before increasing the monthly berthing fee.  *Id.*

In January 2022, Plaintiff notified each floating homeowner and liveaboard resident of its intent to increase berthing fees "to maintain the marina's solvency and functionality."  FAC ¶ 29. These increased fees were to take effect on or before April 1, 2022.  *Id.* ¶ 31.  Prior to the scheduled increases, the berthing fees averaged $574 and were approximately 60-71% below market rate.  *Id.* ¶ 30.  According to Plaintiff, the prior owners were able to keep these low rates because they did not adequately maintain the premises, failed to procure flood insurance, enjoyed lower property tax obligations, and did not have the same debt service obligations.  *Id.*

Plaintiff calculated a fee increase for each of the floating homes and vessels based on several factors, including their location and size.  FAC ¶ 31.  Most berths saw a fee increase between 0-80% while the average fee increase was 30%.  *Id.*  One floating homeowner had his berthing fee raised by 178%.  *Id.*  Plaintiff alleges that it tried to minimize the financial strain on floating homeowners by, for example, accepting to suffer a net monthly loss and extending residents' deadline to pay the increased fee by thirty days.  *Id.* ¶ 32.  Plaintiff also offered to meet with homeowners and the Alameda Floating Home Association, which represents marina residents' interests, to discuss any concerns.  *Id.* ¶ 33.

Around the same time, unbeknownst to Plaintiff, residents were asking the City to intervene and extend rent control provisions to Barnhill Marina.  FAC ¶¶ 33-34.  On April 14, 2022, Plaintiff received a letter from the City Attorney's Office entitled "Investigation of

---

[2] A floating home, unlike a houseboat or liveaboard vessel, is generally not capable of self-propulsion over water and is typically permanently, or semi-permanently, connected to dryland and land-based utilities.  FAC ¶ 21.

United States District Court
Northern District of California

Complaints at Barnhill Marina."  *Id.* ¶ 35, Ex. 1.  In it, the City accused Plaintiff of "demanding to increase [the Homeowners'] rents to nearly double their former levels, on average" and claimed that Plaintiff was negotiating with homeowners "in a confrontational manner."  *Id.* (quotation marks and alterations in original).  Plaintiff alleges that these accusations were false – the average rent increase was approximately 30%, and Plaintiff made "every reasonable effort to address the Homeowners' concerns[.]"  *Id.*  The letter threatened legal action for violations of California's unfair competition law, but the City ultimately took no action.  *Id.* ¶¶ 37, 38.

On April 25, 2022, Plaintiff learned from a reporter that the City was holding a Special Council Meeting on April 28, 2022 (the "April 28 Special Counsel Meeting") to consider the adoption of an urgency ordinance to extend the City of Alameda's Rent Control, Limitations on Evictions, and Relocation Payments to Certain Displaced Tenants Ordinance (the "Rent Control Ordinance") to "a Rental Unit lawfully docked at a Marina."  FAC ¶ 39.

**A.  The Rent Control Ordinance (Ordinance No. 3250)[3]**

The City's Rent Control Ordinance (Ordinance No. 3250) was first enacted in 2016 and is codified at Alameda Municipal Code section 6-58.10 et seq.  Mot. at 3.  It originally provided an exemption to "houseboats" without defining the term.  *See* AMC § 6-58.20.L.  According to the recitals, the Rent Control Ordinance has several key features:

> (a) procedures for the review of rent increases applicable to all rental units, (b) procedures for the stabilization of rent increases above 5% for certain rental units, (c) limitations on the grounds for which landlords may terminate tenancies for tenants in all rental units and (d) a requirement that landlords pay relocation fees when terminating a tenancy for certain reasons, such as a "no cause" tenancy termination.

In addition, section 6-58.75 (Petition Process) allows "[a] Landlord or a Tenant [to] file a petition with the Program Administrator to request an upward or downward adjustment of the Maximum Allowable Rent or Certified Rent" and provides that "[i]n making an individual upward adjustment of Rent, the Hearing Officer shall grant an upward adjustment only if such an

---

[3] The court incorporates the Rent Control Ordinance and Ordinance Nos. 3317, 3321, and 3326 described below by reference because Plaintiff extensively refers to these documents in the FAC and they form the basis of Plaintiff's claims.  *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018) (quoting *United States v. Ritchie*, 342 F.3d 903, 907 (9th Cir. 2003)).

adjustment is necessary in order to provide the Landlord with a constitutionally required fair return on property."  AMC § 6-58.75(A), (G).

**B.  Ordinance No. 3317**

There are three ordinances at issue.  The first was enacted at the April 28 Special Counsel Meeting and is titled "An Uncodified Urgency Ordinance to Take Effect Immediately Upon its Adoption Concerning Rent Control and Limitations on Evictions Applicable to Maritime Residential Tenancies Including Floating Homes."  FAC, Ex. 2 ("Ordinance No. 3317").

Ordinance No. 3317 provides in relevant part that "a Rental Unit lawfully docked at a Marina shall be subject to, and a Tenant shall have the protection of, the City's Rent Control Ordinance, and the City's COVID-19 eviction moratorium."  Ordinance No. 3317, Section 2(A). It further states that "[f]or Rental Units subject to this Ordinance, no person who imposes rent for a Rental Unit shall increase the rent that was in effect on April 14, 2022 . . . Any notice of a rent increase served prior to (or after) April 14, 2022, which increase was to take effect on or after April 14, 2022, shall be void and have no force or effect."  Ordinance No. 3317, Section 2(E).

Under Ordinance No. 3317, a Rental Unit is defined as "a Floating Home, other maritime residential tenancies, or other real property in the City of Alameda offered or available for Rent, and all other Housing Services in connection with the use or occupancy thereof."  Ordinance No. 3317, Section 1.  "Floating Home" is given the same meaning as in California Health and Safety Code section 18075.55(d): a floating structure which is (1) designed and built to be used, or is modified to be used, as a stationary waterborne residential dwelling; (2) has no mode of power of its own; (3) is dependent for utilities upon a continuous utility linkage to a source originating on shore; and (4) has a permanent continuous hookup to a shoreside sewage system.  *Id.*

Plaintiff alleges that around April 14, 2022, the City's special counsel shared at least one proposed version of Ordinance No. 3317 with several of the homeowners at Barnhill Marina, but not with Plaintiff.  FAC ¶ 40.  Plaintiff did not receive a letter, notice, or request for input from the City concerning the proposed ordinance or the April 28 Special Counsel Meeting.  *Id.*  Plaintiff asked the City to continue the Special Council Meeting by sixty days and offered not to charge its increased berthing fee or any penalty or interest to homeowners for the duration of the requested

United States District Court
Northern District of California

United States District Court
Northern District of California

continuance, but the City "refused or ignored" the request and proceeded with the meeting.  *Id.* ¶ 41.

Plaintiff's counsel Galin Luk, and Drishti Narang, a representative for Plaintiff, both attended and testified at the April 28 Special Council Meeting.  FAC ¶ 42.  Luk informed the city council that there had not been an opportunity to gather facts and expressed concern about the Ordinance's failure to tailor its language as well as the long-term viability of Barnhill Marina.  *Id.* Narang urged the city council to consider a broader set of data before making a decision, discussed running a sustainable operation, expressed concern over the future of floating home marinas in Alameda, and stated that the matter was a one-sided presentation of facts.  *Id.*

The City's mayor, Ezzy Ashcraft, also spoke at the April 28 Special Council Meeting, expressing her support for passing the emergency ordinance.  FAC ¶ 43.  She stated that "she has heard many alarming accounts from residents of Barnhill Marina . . . [and] the owner's background does not excuse the kind of behavior experienced by the residents of Barnhill Marina."  *Id.*

At the meeting, city council members and the city attorney allegedly discussed whether the proposed ordinance should be amended to include a statement indicating that Plaintiff—like all other landlords subject to the City's Rent Control Ordinance—could apply for and make use of permanent rent increases pursuant to the City's Capital Improvement Plan, Ordinance No. 15138 ("CIP").  FAC ¶ 44.  The CIP "allows landlords to pass along bona fide long term improvement costs to renters."  *Id.*  The mayor advocated against the statement, "arguing (falsely) that the Homeowners at Barnhill Marina pay 'property taxes,' unlike most renters."  *Id.*  After some discussion, the city council voted to adopt the emergency ordinance without further modification.

Plaintiff further alleges that none of the draft ordinances prepared by the City leading up to the April 28 Special Council Meeting included any language that would have rolled back Plaintiff's April 1, 2022 berthing fee increases.  FAC ¶ 45.  Instead, the draft ordinances included a retroactivity provision that would have gone back only to April 14, 2022.  *Id.*  At the April 28 Special Council Meeting, the mayor asked the city attorney whether the proposed ordinance could be applied retroactively "to the date the ordinance was purportedly first published on April 14,

2022" or to April 1, 2022. *Id.* ¶ 46. The mayor indicated that "she expects the owners of Barnhill Marina to challenge the ordinance in court" and asked the city attorney about "the safest course of action with respect to the ordinance's retroactivity." *Id.* Upon recommendation of the city attorney, the council voted in favor of the "safer" approach—the April 14, 2022 retroactivity date. *Id.*

Plaintiff alleges that, "[a]lthough it is not clear . . . how, when, or by whom," the retroactivity provision was later modified to include the following language: "Rent that was in effect on April 14, 2022 shall mean rent that had been paid on or before April 14, 2022 but not rent to be paid thereafter." FAC ¶ 47. This change effectively rolled back Plaintiff's berthing fees to a "non-uniform date prior to April 1, 2022, more than *two weeks* earlier than the 'safer' April 14 date explicitly agreed upon by City Council at the April 28 Special Council Meeting." *Id.* ¶ 48 (emphasis in original). According to Plaintiff, the precise dates of retroactive application under Ordinance No. 3317 depend on when each homeowner paid their berthing fees, thereby "exploit[ing] the entirely-gratuitous 30-day extension Plaintiff granted to the Homeowners for their deadline to pay their increased April 1 berthing fees." *Id.*

### C. Ordinance No. 3321

On May 17, 2022, the city council approved and adopted Ordinance No. 3321, titled "An Uncodified Ordinance Concerning Rent Control and Limitations on Evictions Applicable to Maritime Residential Tenancies Including Floating Homes." *Id.* ¶ 49, Ex. 3 ("Ordinance No. 3321"). Ordinance No. 3321 contained "the same material change to the original April 28 retroactivity provision" set forth in the published version of Ordinance No. 3317. *Id.*

Although the findings in Ordinance Nos. 3317 and 3321 differ in some ways, both state that "most floating home owners are older residents[,] many are on fixed income and there are few slips for floating homes in the Bay Area other than the ones in the Alameda marinas, rendering floating home owners an extremely vulnerable population, and easily subject to exploitation." Ordinance No. 3317 at 2; Ordinance No. 3321 at 2. The findings further assert that "recently floating homeowners with floating homes in the City of Alameda have been advised that the owner/operation of at least one marina in Alameda intends to increase their monthly rent by as

much as 178%." Ordinance No. 3317 at 3; Ordinance No. 3321 at 2.  In addition, "the City of Alameda faces a . . . housing shortage and has declared a shelter crisis since 2018," and "if floating home residents are not provided with [rent control] protection . . . there will be an immediate and unacceptable disruption to the peace, health, and safety of the City, as vulnerable floating home residents could be immediately and permanently displaced."  Ordinance No. 3317 at 3-4; Ordinance No. 3321 at 3.  Both Ordinances explain that due to the COVID-19 pandemic, housing displacement "limits opportunities to socially distance and increase (sic) the risk of COVID-19 transmission."  Ordinance No. 3317 at 4; Ordinance No. 3321 at 4.

Plaintiff alleges that at the May 17, 2022 meeting regarding Ordinance No. 3321, the mayor instructed the City's staff to notify all marina owners of the City's discussions with landlords regarding amendments to the CIP, as it related to the Rent Control Ordinance.  FAC ¶ 50.  Despite this instruction, Plaintiff asserts that the City did not notify or include Plaintiff in those discussions.  *Id.* ¶ 51.  According to Plaintiff, the City's exclusion of Plaintiff from these discussions was "knowing and purposeful," and has resulted in Plaintiff not knowing whether it may avail itself of the City's CIP provisions to increase its berthing fees.  *Id.* ¶ 51-52.

### D.  Ordinance No. 3326

In June 2022, following the enactment of Ordinance Nos. 3317 and 3321, the City informed all City of Alameda marina owners, including Plaintiff, of their obligation to register for the rent control program.  FAC ¶ 53.  Plaintiff alleges that several owners contested the Ordinances' applicability, arguing that they extended to "floating homes"— but not "liveaboard" vessels, which are docked "in significant numbers" at each of the Alameda marinas.  *Id.*

According to Plaintiff, the City adopted Ordinance No. 3326 on September 6, 2022 in response to those marina owners' opposition.  FAC ¶ 54, Ex. 4 ("Ordinance No. 3326"). Ordinance No. 3326 is titled "Amending the Alameda Municipal Code by Amending Article XV (Rent Control, Limitations on Evictions and Relocation Payments to Certain Displaced Tenants Ordinance) to Adopt and Incorporate Therein Provisions Concerning Floating Homes and Other Marina Residential Tenancies at Floating Home Marinas in the City of Alameda."  In a September 1, 2022 letter to Plaintiff, the City explained that the purpose of Ordinance No. 3326 was to

"limit[] the application of the City's Rent Control Ordinance to floating homes and to maritime residential tenancies *at floating home marinas*." *Id.* ¶ 55 (alterations in original).  In other words, Plaintiff alleges, the City's goal was to extend rent control to "both floating homes and liveaboards berthed at Barnhill Marina," but not to "the other so-called 'recreational' marinas in the City, even though those marinas also have a number of liveaboards." *Id.*  Plaintiff contends that as a result, it is the only marina in the City of Alameda that must comply with rent control obligations for liveaboards. *Id.* ¶ 56.  Because Barnhill Marina is also the only marina with floating homes, it is the only marina subject to the City's rent control, "period." *Id.*

The City explained that it adopted Ordinance Nos. 3317, 3321, and 3326 (the "Ordinances") and applied them retroactively because of the City's housing emergency, which was exacerbated by the COVID-19 pandemic.  FAC ¶ 57.  Plaintiff asserts that these justifications are "clearly pretextual and illegitimate" because there have been no evictions from an Alameda marina "in this century," nor was there any evidence of a threatened eviction at Barnhill Marina or any other marina at the time. *Id.*  Instead, the City adopted the Ordinances to punish Plaintiff for increasing its berthing fees. *Id.* ¶ 61.  If residents continue to fail to pay their berthing fees, Plaintiff may have to file for bankruptcy and permanently close. *Id.* ¶ 62.

The FAC asserts constitutional harms by the City in violation of 42 U.S.C. § 1983. Specifically, Plaintiff alleges the following claims: (1) violation of the Contracts Clause; (2) violation of the prohibition against bills of attainder and ex post facto laws; (3) violation of the Equal Protection Clause; and (4) violation of both procedural and substantive due process.  The City moves to dismiss all claims in the FAC.

## II.    LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the claims alleged in the complaint. *See Parks Sch. Of Bus., Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995). When reviewing a motion to dismiss for failure to state a claim, the court must "accept as true all of the factual allegations contained in the complaint," *Erickson*, 551 U.S. at 94, and may dismiss a claim "only where there is no cognizable legal theory" or there is an absence of "sufficient factual matter to state a facially plausible claim to relief," *Shroyer v. New Cingular Wireless Servs., Inc.*,

622 F.3d 1035, 1041 (9th Cir. 2010) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009); *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001)) (quotation marks omitted).  A claim has facial plausibility when a plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678 (citation omitted).  In other words, the facts alleged must demonstrate "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 555 (2007).

Under Federal Rule of Civil Procedure 15(a), leave to amend should be granted as a matter of course, at least until the defendant files a responsive pleading.  Fed. R. Civ. P. 15(a)(1).  After that point, Rule 15(a) provides generally that leave to amend the pleadings before trial should be given "freely . . . when justice so requires."  Fed. R. Civ. P. 15(a)(2).  "This policy is to be applied with extreme liberality."  *Eminence Capital, LLC v. Aspeon, Inc*., 316 F.3d 1048, 1051 (9th Cir. 2003) (quotation omitted).  However, leave to amend may be denied "where the amendment would be futile."  *Gardner v. Martino*, 563 F.3d 981, 990 (9th Cir. 2009).

## III.    JUDICIAL NOTICE

The City asks the court to take judicial notice of several exhibits.  [Docket Nos. 35-1 ("the City's First RJN"); 38-1 ("the City's Second RJN").]  Plaintiff does not oppose.

Federal Rule of Evidence 201 permits a court to take judicial notice of adjudicative facts.  "The court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201.  "[A] court may take judicial notice of 'matters of public record,'" *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001) (citing *Mack v. S. Bay Beer Distrib.*, 798 F.2d 1279, 1282 (9th Cir. 1986)), and the court need not accept as true allegations that contradict facts that are judicially noticed.  *See Mullis v. United States Bankruptcy Ct.*, 828 F.2d 1385, 1388 (9th Cir. 1987).

The court does not rely on Exhibits AA, CC, DD, EE, and FF in its analysis of the City's motion to dismiss.  Accordingly, the City's request for judicial notice as to those Exhibits is denied as moot.

United States District Court
Northern District of California

1    Exhibit BB is a certified transcript of the City Council Meeting of the City of Alameda,

2    dated April 28, 2022.  Because the transcript is a public record and is relevant to the City's

3    motion, the court takes judicial notice of Exhibit BB.  *See Bd. of Trustees of Leland Stanford*

4    *Junior Univ. v. Cnty. of Santa Clara*, No. 18-CV-07650-BLF, 2019 WL 5087593, at \*4 (N.D. Cal.

5    Oct. 10, 2019) (taking judicial notice of transcript of a public board of supervisor hearing).  The

6    court takes judicial notice only as to the existence of the transcript and the facts contained therein,

7    and not for the truth of the matters asserted in it.  *See Lee*, 250 F.3d at 690.

8    **IV.    DISCUSSION**

9        **A.  Contracts Clause**

10       The FAC alleges that the Ordinances violate the Contracts Clause of the U.S. Constitution

11   by confiscating Plaintiff's contractual rights to its April 1, 2022 increased berthing fees without

12   serving a legitimate public purpose.  FAC ¶ 69.  The City moves to dismiss this claim because

13   Plaintiff has raised no new allegations to overcome the court's previous ruling.  Mot. at 5.

14       The Contracts Clause provides that "[n]o state shall . . . pass any . . . Law impairing the

15   Obligation of Contracts."  U.S. Const. art. I, § 10, cl. 1.  The Supreme Court employs a two-step

16   inquiry to determine whether a state law violates the Contracts Clause.  *See Sveen v. Melin*, 138 S.

17   Ct. 1815 (2018).  The first threshold inquiry is "whether the state law has 'operated as a

18   substantial impairment of a contractual relationship.'"  *Id.* at 1821–22 (quoting *Allied Structural*

19   *Steel Co. v. Spannaus*, 438 U.S. 234, 244 (1978)).  If so, the second inquiry asks whether "the law

20   is drawn in an 'appropriate' and 'reasonable' way to advance 'a significant and legitimate public

21   purpose.'"  *Id.* at 1822 (quoting *Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459

22   U.S. 400, 411–412 (1983)).

23       Here, the court need not decide whether the Ordinances operate as a substantial impairment

24   of a contractual relationship because even assuming they do, Plaintiff has not pleaded sufficient

25   facts to survive the second prong of the Contracts Clause analysis.  *Apartment Ass'n of Los*

26   *Angeles Cnty., Inc. v. City of Los Angeles*, 10 F.4th 905, 913 (9th Cir. 2021), *cert. denied,* 142 S.

27   Ct. 1699 (2022) (even if an ordinance causes "a substantial impairment of contractual relations," it

28   must be upheld "if its adjustment of the rights and responsibilities of contracting parties is based

United States District Court
Northern District of California

United States District Court
Northern District of California

1   upon reasonable conditions and is of a character appropriate to the public purpose justifying the

2   legislation's adoption.").

3          Where, as here, the government is not a party to the contract at issue, "courts properly

4   defer to legislative judgment as to the necessity and reasonableness of a particular measure."

5   *Apartment Ass'n of Los Angeles Cnty.* at 913 (quoting *Energy Reserves*, 459 U.S. at 413).

6   Plaintiff bears the burden of showing that the Ordinances do not serve any valid public purpose or

7   that they are unreasonable.  *Id.*

8          On their face, the Ordinances aim to prevent "an immediate and unacceptable disruption to

9   the peace, health, and safety of the City, as vulnerable floating home residents could be

10  immediately and permanently displaced" during a housing shortage and shelter crisis exacerbated

11  by the COVID-19 pandemic.  *See* Ordinance Nos. 3317, 3321.  In support of this stated purpose,

12  the Ordinances assert that "recently floating home owners with floating homes in the City of

13  Alameda have been advised that the owner/operator of at least one marina in Alameda intends to

14  increase their monthly rent by as much as 178%" and "half of the home owners of these floating

15  homes are over the age of 65, many are low income households and/or on fixed incomes, and

16  many do not have the means to pay these increased rents, thereby facing the prospect of losing

17  their homes and becoming unhoused."  *See, e.g.*, Ordinance No. 3317 at 2.

18         The City explains that the Ordinances themselves demonstrate "the necessity to prevent

19  displacement of long-time residents . . . from exorbitant rent increases" and "modest[ly]" aim to

20  further that goal by limiting rent increases to changes in the Consumer Price Index and

21  establishing a petition process to ensure that landlords receive a fair return on their property.[4]

22  Reply at 5.  As the court previously explained, the Ninth Circuit has recognized that a city's

23  efforts to "mitigate the fallout for those most affected by a shift in the market is a permissible state

24  purpose, even if some may question its policy wisdom."  *See* MTD Order at 13 (quoting *San*

25  *Francisco Taxi Coal. v. City & Cty. of San Francisco*, 979 F.3d 1220, 1225 (9th Cir. 2020)).

26

27  _____

[4] Tellingly, the FAC does not allege that Plaintiff attempted to obtain a fair return through the

28  process set forth in the Ordinances designed to "provide the Landlord with a constitutionally
required fair return on property."  AMC § 6-58.75(A), (G).

United States District Court
Northern District of California

1    Plaintiff claims that the allegations in the FAC nevertheless reveal that the City had an

2  "unreasonably hostile and targeted motive" in enacting the Ordinances.  *See* Opp'n at 15 (pointing

3  to allegations that 1) the City crafted a definition of "rent in effect" specifically for purposes of the

4  Ordinances; 2) the City failed to share a draft of Ordinance No. 3317 with Plaintiff ahead of the

5  April 28 Special Council Meeting; 3) the Mayor supported the Ordinances because of "alarming

6  accounts from residents of Barnhill Marina," not because of a general concern for the public; 4)

7  the City excluded Plaintiff from discussions regarding the CIP; and 5) the Mayor "confessed" at

8  the April 28 Special Council Meeting that she "expect[ed] the owners of Barnhill Marina to

9  challenge the ordinance in court").  According to Plaintiff, no person was actually at risk of

10  eviction when the Ordinances were issued because Plaintiff offered to forego charging its fee

11  increase to the most vulnerable homeowners, and to delay collection of the increase until after

12  April 1, 2022.  Opp'n at 15-16 (citing FAC ¶ 9).  In addition, Plaintiff takes issue with the fact that

13  both the housing crisis and the COVID-19 pandemic predated the Ordinances.  Opp'n at 16.  For

14  Plaintiff, these allegations show that the City's "true intentions" were not to protect a vulnerable

15  population from displacement.  *See id.*

16    In effect, Plaintiff asks the court to impute an intent element into the Contracts Clause

17  analysis.  Plaintiff provides no authority for this position, nor did the court find any.  *C.f.*

18  *DoorDash, Inc.*, 2022 WL 867254, at \*15 (noting that "none of the courts in the cases that

19  Plaintiffs cite question the legislative record or intent; instead the courts reiterate the deference to

20  a legislature's choice in selecting the means of a law").

21    Plaintiff attempts an analogy to *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234

22  (1978), arguing that the Supreme Court invalidated a law that appeared to be aimed largely at a

23  single employer.  *See* Opp'n at 14-15.  Plaintiff made that argument before and it is still

24  unpersuasive.  *See* MTD Order at 13.  In *Allied Structural Steel*, the plaintiff challenged a

25  Minnesota statute requiring a private employer to pay additional pension benefits if it terminated

26  its pension plans or closed Minnesota offices.  *Id.* at 247.  In examining the challenged pension

27  law under the second prong of the Contracts Clause analysis, the Supreme Court found that the

28  law served no public interest because it was "not even purportedly enacted to deal with a broad,

1    generalized economic or social problem." *Id.* at 247-50.  In contrast, here the City's purpose is

2    expressly stated in Ordinance Nos. 3317 and 3321.

3          Plaintiff also appears to argue that the Ordinances were not drawn in a reasonable and

4    appropriate way to advance the City's "purported purpose," thus further undermining the City's

5    claim that it genuinely acted in response to state and county-wide states of emergency.  Opp'n at

6    16.  Plaintiff argues that the City should have been aware of alternative, reasonable methods to

7    achieve its goal.  Opp'n at 15.  As Plaintiff conceded at the hearing on the City's first motion to

8    dismiss, courts are not required to consider the availability of less intrusive means under the

9    Contracts Clause.

10          Plaintiff also complains that the Ordinances are "entirely open-ended in duration" and

11    "purposefully *exclude*[] all other marinas from its rent control requirements."  Opp'n at 16

12    (emphasis in original).  The court previously addressed and rejected these arguments.  *See* MTD

13    Order at 14.  As a preliminary matter, the City's "public purpose need not be addressed to an

14    emergency or temporary situation."  *Energy Rsrvs.*, 459 U.S. at 412.  Second, Plaintiff's objection

15    that the Ordinances "exclude all other marinas" from rent control requirements mischaracterizes

16    the record.  As alleged in the FAC, Barnhill is the only marina in the City that berths floating

17    homes, and is therefore currently the only floating home marina.  FAC ¶ 56.  If another floating

18    home marina opened tomorrow, it would be subject to rent control because the Ordinances'

19    express terms make clear that their provisions apply to all floating home marinas.  In any event, a

20    law that appears to target one business group over another "is not *a priori* suspect."  *DoorDash,*

21    *Inc.*, 2022 WL 867254, at *11.  Rather, the court must "refuse to second-guess the City's

22    determination that [the Ordinances] constitute[] the most appropriate way[] of dealing with the

23    problem[s] identified."  *Apartment Ass'n of L.A.*, 10 F.4th at 914 (internal quotation marks and

24    citation omitted).

25          Under these circumstances, Plaintiff has not plausibly alleged that the Ordinances violate

26    the Contracts Clause.  Accordingly, the City's motion to dismiss is granted with respect to that

27    claim.

28

**B.  Bill of Attainder and Ex Post Facto**

Plaintiff alleges that Ordinance Nos. 3317, 3321, and 3326 constitute bills of attainder and ex post facto laws because the City enacted them to inflict punishment on Plaintiff without judicial trial by confiscating Plaintiff's right to its berthing fee increases.  FAC ¶¶ 76, 83.

### 1.  Bill of Attainder

The Constitution states that "No Bill of Attainder . . . shall be passed."  U.S. Const. art. I, § 9, cl. 3.  A bill of attainder is "a law that legislatively determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial."  *SeaRiver Mar. Fin. Holdings, Inc. v. Mineta*, 309 F.3d 662, 668 (9th Cir. 2002) (*quoting Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 468 (1977)).  A statute is an unconstitutional bill of attainder if it (1) specifies the affected persons, and (2) inflicts punishment (3) without a judicial trial.  *Id.* (citing *Selective Serv. Sys. v. Minnesota Pub. Interest Research Group*, 468 U.S. 841, 847 (1984)).

Focusing on the second element of the analysis, three factors inform whether a statute inflicts punishment on the specified individual or group: "(1) whether the challenged statute falls within the historical meaning of legislative punishment; (2) whether the statute, viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes; and (3) whether the legislative record evinces a congressional intent to punish."  *Id.* at 673 (internal quotation marks omitted).

As to the first factor, Plaintiff argues that the City's confiscation of its vested contractual rights—as opposed to the City's implementation of prospective "price controls"—fits squarely within the historical meaning of legislative punishment.  Opp'n at 17.

Plaintiff relies on a single case in support of its statement that "confiscation of property fits squarely within the historical meaning of punishment."  *See* Opp'n at 17 (citing without analyzing *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 474 (1977)).  *Nixon* does not aid Plaintiff's argument.  In *Nixon*, the Court gave several examples of "punishment traditionally judged to be prohibited by the Bill of Attainder Clause," such as death, imprisonment, banishment, "the punitive confiscation of property by the sovereign," and exclusion from practicing one's profession.  *Nixon*, 433 U.S. at 473-74.  The Court concluded that President Nixon—who

United States District Court
Northern District of California

challenged a congressional act directing the General Services Administration to take custody of his presidential papers and tape recordings—could not claim to have suffered any of these "forbidden deprivations." *Id.* at 475.  Although the appellant claimed the records as his "property," the Court noted that the act included a provision for an award of "just compensation." *Id.*  That provision, the Court held, "undercuts even a colorable contention that the Government has punitively confiscated appellant's property, for the owner (thereby) is to be put in the same position monetarily as would have occupied if his property has not been taken." *Id.* (internal quotations and citation omitted).[5]  The Court concluded that the challenged act did not fall within the historical meaning of legislative punishment.  *Id.*

For its part, the City cites *640 Broadway Renaissance Co. v. Cuomo*, 740 F. Supp. 1023, 1034, 1035-36 (S.D.N.Y. 1990), *aff'd sub nom. 640 Broadway v. Cuomo*, 927 F.2d 593 (2d Cir. 1991), in which the court held that rent control did not constitute a "punitive confiscation of property."  Reply at 6.  In *Broadway Renaissance*, the plaintiff claimed that the New York State legislature had retroactively singled out a small group of property owners, subjecting them to "the strictest rent control" among other economic burdens.  140 F. Supp. at 1034.  There too, the plaintiff seized on the "punitive confiscation of property" from *Nixon*, arguing that the challenged law constituted "economic confiscation in the nature of punishment."  *Id.* at 1035.  The court disagreed, finding that "the legislation in issue is an example of economic regulation in today's complex world, and is rationally related to the legitimate and non-punitive legislative goal of providing safe and habitable housing."  *Id.* at 1035-36.

Plaintiff does not explain how the Ordinances result in a "punitive confiscation of property by the sovereign" under *Nixon*, particularly in light of the fact that they include a fair rate of return process.  Plaintiff offers no persuasive reason to diverge from the straightforward analysis in *Nixon* and *640 Broadway Renaissance Co.*  In line with these cases, the court finds that the Ordinances do not fall within the historical meaning of legislative punishment.

With respect to the second factor – whether the statute, viewed in terms of the type and

---

[5] Similarly, the Ordinances incorporate a fair return petition process so that landlords like Plaintiff can seek rent increases that provide a constitutionally required fair return on property.

1  severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes –

2  Plaintiff argues that the Ordinances do not address "an immediate or prospective risk."  Opp'n at

3  18.  Rather, Plaintiff asserts, the City re-wrote the definition of "rent in effect" behind closed

4  doors, and the City refused to include a CIP provision – allowing landlords subject to the City's

5  Rent Control Ordinance to pass along bona fide long term improvement costs to renters – in the

6  Ordinances.[6]  Opp'n at 18 (citing FAC ¶¶ 44, 45-47).

7          Once again, Plaintiff refuses to grapple with binding legal authority.  Even if its assertions,

8  taken as true, could give rise to an inference of animus against Plaintiff, "animus" does not

9  translate into punitive intent for purposes of a Bill of Attainder claim.  *Olson v. California*, 62

10  F.4th 1206, 1222 (9th Cir. 2023).  The Ninth Circuit instead applies a "functional test" to

11  determine whether a statute was enacted in furtherance of non-punitive legislative purposes.  That

12  test asks:

13          whether the law under challenge, viewed in terms of the type and
        severity of burdens imposed, reasonably can be said to further
14          nonpunitive legislative purposes. Where such legitimate legislative
        purposes do not appear, it is reasonable to conclude that punishment
15          of individuals disadvantaged by the enactment was the purpose of the
        decisionmakers.
16

17  *SeaRiver*, 309 F.3d at 674 (quoting *Nixon*, 433 U.S. at 475).  "[E]ven if the Act singles out an

18  individual on the basis of irreversible past conduct, if it furthers a nonpunitive legislative purpose,

19  it is not a bill of attainder."  *Id.*

20          Applying the functional test in *SeaRiver*, the Ninth Circuit affirmed dismissal of the

21  complaint.  It found that the plaintiff had not carried its burden of establishing that the legislature's

22  action constituted punishment and not merely the legitimate regulation of conduct.  309 F.3d at

23  674 (examining Oil Pollution Act of 1990, which, among other things, excluded the T/V Exxon

24  Valdez from Prince William Sound after the oil tanker spilled millions of gallons of oil into the

25  Sound the previous year).  In so holding, the Ninth Circuit emphasized that "[t]he fact that the

26

27  ─────────────────────
   [6] Contrary to the allegations in the FAC, the CIP pass-through process is available to Plaintiff, a
   fact which Plaintiff completely fails to acknowledge.  The City explains that while Ordinance Nos.
28  3317 and 3321 initially excluded marinas from the CIP pass-through process, Ordinance No. 3326
   repealed those provisions.  Reply at 3; Ordinance No. 3326 at 13.

United States District Court
Northern District of California

provision places an additional burden upon [plaintiff] does not affect our conclusion.  Although Congress was aware when it passed [the provision at issue] that it would impose a cost on [plaintiff], this awareness does not translate into a suggestion that Congress's intent was to punish, rather than to reduce the environmental risk to the Sound." *Id.* at 674-75.  In the same vein, the Ninth Circuit found that Congress legitimately concluded that the Exxon Valdez presented an unreasonable risk to Prince William Sound, which in turn was sufficient to justify the restriction on the plaintiff's use of the vessel in that area.

Here, the Ordinances' plain text expressly describes the legitimate nonpunitive purpose of protecting vulnerable populations from the risk of displacement—particularly amid a housing crisis and a pandemic.  The Ordinances address this risk by protecting floating home marina residents from exorbitant rent increases, while allowing landlords to petition for a higher rent through the fair return petition process.[7]  In light of the Ordinances' findings that exorbitant rent increases pose an immediate and permanent risk to vulnerable floating home residents, many of whom are over 65 and low-income, "legitimate justifications for passage of the [Ordinances] are readily apparent." *Fresno Rifle & Pistol Club, Inc. v. Van De Kamp*, 965 F.2d 723, 728 (9th Cir. 1992) (applying functional test on motion to dismiss and finding assault weapons statute was not a bill of attainder).

As to the final factor – whether the legislative record evinces a congressional intent to punish – Plaintiff argues that the legislative history demonstrates that the confiscation of its fee increases was punitive.  Opp'n at 18.  Plaintiff points to the following allegations in the FAC: 1) the City's Prosecution Unit threatened to take legal action against Plaintiff on grounds that its fee increases violated state law but ultimately took no action (*see* FAC, Ex. 1); 2)  immediately prior to confiscating Plaintiff's contractual interests, the mayor and other councilmembers expressly

---

[7] Plaintiff suggests that the City had alternate means to address its stated concerns because Plaintiff had offered to hold off on collecting rent increases if the City delayed the April 28 Special Council Meeting.  Opp'n at 18 (arguing that the City's confiscation of its rent increases was not "in any way necessary").  This is a weak argument.  Deferring collection of the higher rent for a short period of time – "for the duration of that continuation" of the meeting (*see* FAC ¶ 9) – does not address the stated legislative purpose of preventing displacement of vulnerable City residents.

United States District Court
Northern District of California

chastised Plaintiff at the April 28 Special Council Meeting, stating "the owner's background does not excuse the kind of behavior experienced by the residents of Barnhill Marina" (FAC ¶ 43); and 3) the City refused to treat Plaintiff like other landlords by "expressly failing to incorporate the City's Capital Improvement Plan Policy into the Ordinances" (FAC ¶ 44).[8]  Opp'n at 18.

These allegations do not "unmistakably manifest" an intent to punish Plaintiff.  *SeaRiver*, 309 F.3d at 676.  Lawmakers' actions or statements that suggest animus do not directly translate into a legislative intent to punish.  By nature, the political process generates strong opinions; equating policymakers' negative views with "punitive intent" therefore is not legally supportable. *See Olson*, 62 F.4th at 1222; *see also S. California Healthcare Sys., Inc. v. City of Culver City*, No. 221CV05052MCSRAO, 2022 WL 1394751, at *8 (C.D. Cal. Jan. 19, 2022), *aff'd*, No. 22-55166, 2023 WL 234787 (9th Cir. Jan. 18, 2023) ("Although some allegations might give rise to an inference of animus by the City against [the plaintiff] or collusion between the City and [labor union intervenor], no allegation provides '*unmistakable* evidence of punitive intent' in enacting the Ordinance itself").  The Ordinances' plain text and findings support the City's stated desire to protect vulnerable floating home residents from immediate and permanent displacement; they do not demonstrate an "unmistakably" vindictive motive to punish Plaintiff.  *See Dairy v. Bonham*, No. C-13-1518 EMC, 2013 WL 3829268, at *13 (N.D. Cal. July 23, 2013) (dismissing Bill of Attainder claim where court could not infer "more than a mere possibility" of punitive intent).

As the complaint fails to plausibly allege that the Ordinances inflict punishment within the meaning of the constitutional prohibition against bills of attainder, Plaintiff's claim is dismissed.[9]

---

[8] As noted above in footnote 5, the third allegation is factually inaccurate and inconsistent with the Ordinances themselves.  Ordinance No. 3326 makes clear that the CIP pass-through provision is available to Plaintiff.

[9] As the court concludes that the Ordinances do not inflict punishment, it need not decide whether Plaintiff satisfies the first and third elements of the bill of attainder claim.  *See Fowler Packing Co., Inc. v. Lanier*, 844 F.3d 809, 817 (9th Cir. 2016) (declining to address remaining elements of bill of attainder claim after concluding that carve-outs in safe harbor provision of California's piece-rate wage law did not impose punishment).  However, the court notes that Plaintiff once again argues that it has alleged the first element of specificity because Plaintiff is "easily ascertainable" from facts surrounding enactment of the Ordinances.  Opp'n at 18-19.  In its previous order, the court recounted the parties' positions on this point and noted that Plaintiff did not engage with or attempt to distinguish *Nixon*, a case proffered by the City for the proposition that "the Act's specificity—the fact that it refers to [President Nixon] by name—does not

### 2. Ex Post Facto

The Constitution prohibits state governments from enacting any "ex post facto Law."  Art. I, § § 10, cl. 1.  "The Ex Post Facto Clause prohibits the government from enacting laws with certain retroactive effects, including laws that change the punishment and inflict greater punishment for the crime than the punishment authorized by law when the crime was committed."  *Cody v. Grounds*, No. C 12-2603 SI PR, 2012 WL 2953179, at *3 (N.D. Cal. July 19, 2012) (citing *Stogner v. California*, 539 U.S. 607, 611–12 (2003); *Calder v. Bull*, 3 U.S. 386 (1798)).

As conceded by Plaintiff at the hearing on the City's first motion to dismiss, the ex post facto claim must be dismissed if the bill of attainder claim fails on the infliction of punishment prong.  Accordingly, the City's motion is granted as to Plaintiff's ex post facto claim.  *See also Hasbrouck v. Cnty. of Yavapai*, No. CV-20-08112-PCT-DWL, 2021 WL 4458239, at *6, n.4 (D. Ariz. Sept. 29, 2021) (dismissing ex post facto claim because statute at issue did not create a criminal offense and was not punitive under the court's bill of attainder analysis).

### C. Equal Protection Clause

The FAC alleges that the City violated the Equal Protection Clause because it "discriminated against Plaintiff in a manner that is intentional, arbitrary, and capricious by enacting Ordinances 3317, 3321, and 3326, for the purpose of (1) rolling back Plaintiff's April 1, 2022 fee increases; and (2) extending and enforcing rent control solely on Plaintiff but not the similarly situated Alameda marina owners or the similarly situated Homeowners at Barnhill Marina who rent out their units to their parties."  FAC ¶ 90.  Plaintiff asserts that the City did so without any rational basis for believing that the Ordinances would advance a legitimate public purpose.  *Id.* ¶ 91.

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike."  *City of Cleburne v. Cleburne*

---

automatically offend the Bill of Attainder Clause."  *Nixon*, 433 U.S. at 471–72.  Plaintiff maintains that it is "easily ascertainable" but again fails to mention let alone grapple with *Nixon* on this point.

United States District Court
Northern District of California

*Living Ctr.*, 473 U.S. 432, 439 (1985) (quoting *Plyler v. Doe*, 457 U.S. 202, 216 (1982)). Typically, claims under the Equal Protection Clause challenge "governmental classifications that 'affect some groups of citizens differently than others.'" *Engquist v. Oregon Dep't of Agr.*, 553 U.S. 591, 601 (2008) (quoting *McGowan v. Maryland*, 366 U.S. 420, 425 (1961)).

The court previously declined to decide whether Plaintiff's class-of-one theory was cognizable as a matter of law, and reviewed Plaintiff's claim under the rational basis test because both parties agreed that a suspect classification was not implicated. In so doing, the court held that because the City's reasons for enacting the Ordinances were rational, Plaintiff failed to state a plausible violation of the Equal Protection Clause.

Plaintiff now reasserts its class-of-one theory and argues that the court should specifically analyze "whether the City has a rational basis for treating Plaintiff differently than similar situated persons in pursuit of its purportedly legitimate goals" – as opposed to whether the City generally has a rational basis for "expanding rent control."[10] Opp'n at 20.

A "class-of-one" equal protection claim, which does not depend on a suspect classification such as race or gender, arises where the plaintiff alleges that a state or local government "(1) intentionally (2) treated [plaintiff] differently than other similarly situated [individuals or groups], (3) without a rational basis." *Seaplane Adventures, LLC v. Cnty. of Marin*, 71 F.4th 724, 729 (9th Cir. 2023) (quoting *Gerhart v. Lake Cnty.*, 637 F.3d 1013, 1022 (9th Cir. 2011)). "[T]he rational basis prong of a 'class of one' claim turns on whether there is a rational basis for the *distinction*, rather than the underlying government action." *Id.* at 730 (emphasis in original) (internal quotation marks and citation omitted).

---

[10] In previously concluding that none of Plaintiff's allegations meaningfully refuted the City's stated legitimate legislative purpose to provide affordable housing and protect vulnerable residents from displacement or constructive eviction, the court noted that "[w]here a regulation or statute affects only economic . . . interests," as here, "the state is free to create any classification scheme that does not invidiously discriminate." MTD Order at 20 (quoting *San Francisco Taxi Coal.*, 979 F.3d at 1224 (citation omitted)). If there are "plausible, arguable, or conceivable reasons which may have been the basis for the distinction," the court explained, the Ordinances must be upheld. *Id.* (citation omitted). Stated differently, in holding that the City had a rational basis for enacting the Ordinances, the court found that the City had a rational basis for expanding rent control to floating homes and other maritime residential tenancies at floating home marinas, including Plaintiff, "[r]egardless of the relevant comparison category." *Seaplane Adventures, LLC*, 71 F.4th at 730.

20

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiff alleges that it was intentionally targeted when the City repeatedly expressed its animosity in public hearings on the Ordinances, excluded Plaintiff from communications with interested stakeholders and drafts of Ordinance No. 3317, failed to provide Plaintiff with meaningful advanced notice of the April 28 Special Council Meeting, refused to delay the meeting even though Plaintiff offered to postpone charging the increased fee, and altered the retroactivity language in Ordinance No. 3317 behind closed doors. Opp'n at 21-22 (citing FAC ¶¶ 39-40, 43, 45-47).

Assuming without deciding that these facts plausibly allege intentional differential treatment, the claim nevertheless fails because the FAC does not identify a "similarly situated" group or individual treated differently by the Ordinances. Individuals or groups "allegedly treated differently in violation of the Equal Protection Clause are similarly situated only when they are 'arguably indistinguishable.'" *Erickson v. County of Nevada ex rel. Bd. of Supervisors*, 607 F. App'x 711, 712 (9th Cir. 2015) (quoting *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 601 (2008)). Here, Plaintiff argues that it is similarly situated to 1) other Alameda marinas; 2) owners of floating homes and vessels berthed at Barnhill Marina; and 3) apartment building owners in the City. Opp'n at 20-21.

The FAC does not offer any factual allegations for this court to compare Plaintiff's relevant characteristics with those of other Alameda marinas, owners of floating homes and vessels berthed at Barnhill Marina, or apartment building owners in the City. *See S. California Healthcare Sys., Inc.*, 2022 WL 1394751, at *5 (C.D. Cal. Jan. 19, 2022). Plaintiff instead offers conclusory assertions. *See, e.g.*, FAC ¶ 90 ("The City discriminated against Plaintiff in a manner that is intentional, arbitrary, and capricious by enacting Ordinances 3317, 3321, and 3326, for the purpose of . . . extending and enforcing rent control solely on Plaintiff but not the similarly situated Alameda marina owners or the similarly situated Homeowners at Barnhill Marina who rent out their units to third parties").

At most, Plaintiff alleges that "other so-called 'recreational' marinas in the City . . . also have a number of liveaboards" and their residents "are no different in character than those residents at Barnhill Marina." *Id.* ¶ 53. These assertions are scant and do not demonstrate that

United States District Court
Northern District of California

recreational marinas are "arguably indistinguishable" from Plaintiff. *See Erickson*, 607 F. App'x at 712.[11]  In fact, the FAC itself provides rational bases for differential treatment between Plaintiff and other Alameda marinas.  First, the FAC acknowledges that Barnhill Marina currently is the only marina in the City that has floating homes.  FAC ¶ 56.  This itself is a rational reason to treat it differently from other marinas.  Moreover, Plaintiff admits that it increased its berthing fees on average by 30%, and that at least one floating homeowner's berthing fee was raised by approximately 178%.  FAC ¶ 31.  The Ordinances state that, in light of these fee increases, they aim to avoid "an immediate and unacceptable disruption to the peace, health, and safety of the City, as vulnerable home residents could be immediately and permanently displaced."  *See, e.g.*, Ordinance No. 3317 at 3.  The Ordinances further explain that "such outcomes would not only endanger the health and safety of the displaced owners of floating homes, but create severe harm to the City as a whole and exacerbate the serious local, regional and state wide homelessness crisis."  *Id.*

Plaintiff does not address these points, even though it bears a heavy burden even at the pleading stage.  *See Madden v. Commonwealth of Kentucky*, 309 U.S. 83, 88 (1940) ("The burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it").  Instead, it argues in a conclusory manner that "any alleged rational basis for [intentionally targeting Plaintiff] was objectively false and . . . based on improper motive."  Opp'n at 21.  The Supreme Court and the Ninth Circuit have made clear that "it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature."  *RUI One Corp. v. City of Berkeley*, 371 F.3d 1137, 1155 (9th Cir. 2004) (quoting *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 315 (1993)).  In addition, "reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind.  The legislature may select one phase of one field and apply a

---

[11] Plaintiff's other proposed comparisons between the owner of Barnhill Marina on the one hand, and an owner of a floating home or an owner of an apartment building on the other, fall far short of the "arguably indistinguishable" standard.  The interests and characteristics of the landlord/owner of a marina are clearly different from those of the marina tenant who owns a floating home berthed at the marina.  And marina landlords are quite differently situated from landlords of land-bound buildings.

remedy there, neglecting the others." *Id.* (internal quotation marks and alterations omitted) (finding rational basis where local government expanded living wage ordinance to certain employers but not others).  Here, the City was entitled to proceed iteratively to address Plaintiff's "exorbitant rent increases," initially regulating floating home marinas without imposing restrictions on non-floating home marinas.

Because plausible reasons support the Ordinances, the court finds that Plaintiff has not pleaded sufficient facts alleging that the Ordinances fail rational basis review.  Accordingly, the City's motion to dismiss is granted with respect to this claim.

### D.  Due Process Clause

Plaintiff alleges that the Ordinances violate the Due Process Clause, which provides that no state may "deprive any person of life, liberty, or property, without due process of law[.]"  U.S. Const., amend. XIV.  Plaintiff asserts both procedural and substantive due process claims.

### 1.  Procedural Due Process

To allege a violation of procedural due process, Plaintiff must establish: "(1) a liberty or property interest protected by the Constitution; (2) a deprivation of the interest by the government; [and] (3) lack of process."  *Portman v. Cty. of Santa Clara*, 995 F.2d 898, 904 (9th Cir. 1993).  Notice and a meaningful opportunity to be heard are "the hallmarks of procedural due process."  *Ludwig v. Astrue*, 681 F.3d 1047, 1053 (9th Cir. 2012) (internal quotations and citation omitted).

Plaintiff claims it has a protected property interest in its vested contractual rights to collect the increased fee amounts effective April 1, 2022, as well as in the marina itself.  Opp'n at 22.  Even assuming for purposes of argument that Plaintiff had a vested interest in the rent increases allowed by prior law, Plaintiff's theory that the City excluded Barnhill Marina from the political process fails to state a claim for violation of procedural due process.  *Id.* at 23.

When "the action complained of is legislative in nature, due process is satisfied when the legislative body performs its responsibilities in the normal manner prescribed by law."  *Hotel & Motel Ass'n of Oakland v. City of Oakland*, 344 F.3d 959, 969 (9th Cir. 2003) (internal quotation marks and citation omitted).  This is because "even though an individual's property rights may be affected by the enactment of a general statute, where a rule of conduct applies to more than a few

people, it is impracticable that everyone should have a direct voice in its adoption." *Id.* (cleaned up).  However, where "only a few persons are targeted or affected and the state's action exceptionally affects them on an individual basis," greater procedural rights may attach.  *Id.* (cleaned up) (quoting *Harris v. County of Riverside*, 904 F.2d 497, 502 (9th Cir. 1990)).  "[T]he mere fact that a subcategory of [entities] motivated the [government] to act does not change the legislative quality of the ordinance."  *Id.*

Plaintiff alleges that prior to the April 28 Special Council Meeting, the City posted four draft ordinances on its website.  They each contained the following retroactivity language:

> For Rental Units subject to this Ordinance, no person who imposes rent for a Rental Unit shall increase the rent that was in effect on April 14, 2022.  Any notice of a rent increase served prior to (or after) April 14, 2022, which increase was to take effect on or after April 14, 2022, shall be void and have no force or effect.

FAC ¶ 45.  Plaintiff further alleges that at the April 28 Special Council Meeting, the city council voted in favor of adopting the April 14, 2022 retroactivity date proposed in the draft ordinances.  *Id.* ¶ 46.  That retroactivity provision was allegedly later modified, as the published version of Ordinance No. 3317 contains the following language:

> For Rental Units subject to this Ordinance, no person who imposes rent for a Rental Unit shall increase the rent that was in effect on April 14, 2022.  Rent that was in effect on April 14, 2022 shall mean rent that had been paid on or before April 14, 2022 but not rent to be paid thereafter.  Any notice of a rent increase served prior to (or after) April 14, 2022, which increase was to take effect on or after April 14, 2022, shall be void and have no force or effect."  *Id.* ¶ 47.  Plaintiff alleges that this provision is "substantially different . . . from any version published in advance of the April 28 meeting or known by Plaintiff to have been considered by the City Council on April 28, 2022."

*Id.*

In its opening brief, the City explains that the city council "properly directed a change to the staff-recommended effective date before voting to adopt the ordinances," and the final published ordinances accurately reflect this amendment.  Mot. at 14.  The City argues that the transcript from the April 28 Special Council Meeting corroborates that the draft language was disclosed.  *Id.* at 1, n.1 (citing the City's First RJN, Ex. BB).  According to the City, Plaintiff should have been aware of the amendment, as its counsel attended and testified at the hearing.  *Id.*

24

1    at 14 (citing FAC ¶ 42 (recounting comments made by Plaintiff's counsel Galin Luk, and Drishti

2    Narang, a representative for Plaintiff to the city council, as recorded in minutes of the April 28

3    Special Council Meeting)).

4          Plaintiff's opposition avoids addressing these points, reiterating instead in a conclusory

5    way that "[s]imply put, the City did not act in a 'normal manner.'"  Opp'n at 23 (citing *Sierra*

6    *Lake Rsrv. v. City of Rocklin*, 938 F.2d 951, 956 (9th Cir. 1991), *cert. granted, judgment vacated*

7    *sub nom. City of Rocklin v. Sierra Lakes Rsrv.*, 506 U.S. 802 (1992), and *opinion vacated in part*,

8    987 F.2d 662 (9th Cir. 1993)).

9          Plaintiff's reliance on *Sierra Lake* is not compelling.  Sierra Lake alleged that the city of

10   Rocklin effectively cancelled its September 1, 1979 rent increase when it imposed rent control on

11   mobile home parks on November 5, 1979.  *Sierra Lake*, 938 F.2d at 953.  Sierra Lake applied for a

12   rent increase under the ordinance on October 16, 1984 and again on August 30, 1985, but both

13   applications were rejected by the Rocklin city manager, and Sierra Lake's rent increase only

14   became effective on December 1, 1985.  *Id.* at 953-54.  Sierra Lake alleged a procedural due

15   process violation based on these allegations, advancing three different theories.  It first argued that

16   its property interest was diminished or impaired when Rocklin passed the rent control ordinance

17   and made it retroactive.  *Id.* at 956.  Its second and third theories claimed that the alleged

18   deprivation occurred in connection with the city manager's wrongful rejection of the rent increase

19   applications.  *Id.*  As to Sierra Lake's first theory, the Ninth Circuit held that "it simply fails to

20   state a claim for procedural due process [because Sierra Lake] received all the process due it when

21   the City's elected officials discharged their legislative responsibilities in the matter prescribed by

22   law."  *Id.* at 957.  As to the second and third theories, the Ninth Circuit declined to analyze

23   whether they stated a violation of procedural due process; it reviewed the allegations as

24   substantive due process claims instead.  *Id.* ("Where, as here, the plaintiff alleges that the denial of

25   due process consists of an official's arbitrary action, a claim for violation of substantive due

26   process is indistinguishable from a claim for violation of procedural due process.").

27         Plaintiff does not cite any other authority to support its conclusory claim that any of the

28   alleged acts or omissions establish that the City did not act in a "normal manner prescribed by

United States District Court
Northern District of California

law," or that the City's actions cannot "as a matter of law" be held constitutionally permissible. *See* Opp'n at 23.  In addition, the transcript from the April 28 Special Council Meeting suggests that city councilmembers discussed and adopted the retroactivity provision at issue, *see* City's First RJN, Ex. BB at 76:18-79:23, and the FAC acknowledges that Plaintiff's representatives actually appeared and testified during public meetings on the Ordinances.  *See* FAC ¶ 42.

Because the city council "exercised its legislative functions in a lawful manner, [Plaintiff] received all the process that was due."  *Hotel & Motel Ass'n of Oakland*, 344 F.3d at 970.

### 2.  Substantive Due Process Claim

A "regulation that fails to serve any legitimate governmental objective may be so arbitrary or irrational that it runs afoul of the Due Process Clause."  *Ballinger v. City of Oakland*, 398 F. Supp. 3d 560, 575 (N.D. Cal. 2019), *aff'd*, 24 F.4th 1287 (9th Cir. 2022) (quoting *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 542 (2005)).  The plaintiff's burden on such a claim is "extremely high."  *Richardson v. City & Cnty. of Honolulu*, 124 F.3d 1150, 1162 (9th Cir. 1997).

Here, Plaintiff argues that the Ordinances violate substantive due process because they deprive Plaintiff of a fair return on its property and are "clearly arbitrary and unreasonable with no substantial relation to public health, safety, or general welfare."  Opp'n at 23.

The court previously held that a claim for infringement of a substantive due process right requires Plaintiff to demonstrate that the Ordinances have no legitimate purpose.  In this case, the plain text and findings set forth in the Ordinances explain their legitimate stated purpose: to protect vulnerable residents from displacement.  Plaintiff therefore failed to state a claim for substantive due process.  MTD Order at 23-24.

Plaintiff does not point to any new allegation relevant to the court's prior ruling, arguing instead that the Ordinances have "economically hobble[d]" Plaintiff such that it is unable to seek "relief that might otherwise be available to it, such as a fair rate of return petition."  Opp'n at 23. These allegations do not plausibly allege that the Ordinances have no legitimate purpose.  In addition, the court previously declined to accept Plaintiff's conclusory and speculative claims that it is unable to avail itself of the fair rate of return process.  Accordingly, Plaintiff's substantive and procedural due process claims are dismissed.

## V. CONCLUSION

In light of the above, the City's Motion to Dismiss the FAC is granted.  Plaintiff has already been granted leave to amend and was directed to "plead its best case" in the court's order on the City's motion to dismiss the complaint.  As Plaintiff's claims suffer from the same deficiencies as its original claims, the court dismisses the FAC with prejudice.  The Clerk shall enter judgment and close the file.

**IT IS SO ORDERED.**

Dated: November 20, 2023

_____
Donna M. Ryu
Chief Magistrate Judge